Whitaker, Judge,
delivered the opinion of the court:
The controversy before us concerns the applicability of an excise tax to certain machines, manufactured by Davidson Corporation prior to 1953, and thereafter by Mergenthaler Linotype Company, of which the Davidson Corporation in 1950 had become a wholly-owned subsidiary. Although Mer-genthaler took over the manufacture of these machines in 1953, with Davidson functioning as a sales subsidiary, the machines continued to be marketed under the Davidson name. Both Davidson and Mergenthaler filed suits in this court for refund of excise taxes each paid during the 1950-1959 period, These suits were consolidated for trial on the merits.
*423 The determination of the case depends solely upon the resolution of a single issue: whether certain Davidson machines[1] were, during the period covered by the claims, “duplicating machines” within the purview of Section 3406 (a) (6) of the Internal Revenue Code (1939) and its counterpart, Section 4191, Internal Revenue Code (1954), both of which follow.
Internal Revenue Code of 1939:
r-uo 53 H OS?£) O tH M * Hi I® ca • T — Í § o h>J — I 2 'vs t 3 o c «as | Is oT Í | | » g r° H £ ^ • <y-i rgj ° I o c VI *5 ^ 'S <3 lO <D £ CO sllS £> <1 00 oPhH d CO
(а) ImpositioN. — There shall be imposed on the following articles, sold by the manufacturer, producer, or importer, a tax equivalent to the rate on the price for which sold, set forth in the following paragraphs (including in each case parts or accessories of such articles sold on or in connection therewith, or with the sale thereof):
* * $ $ 4*
(б) Business and store machines. — Adding machines, addressing machines, autographic registers, bank proof machines, billing machines, bookkeeping machines, calculating machines, card punching machines, cash registers, except cash registers of the type used in registering over-the-counter retail sales, change making machines, check writing machines, check signing machines, check canceling machines, check perforating machines, check cutting machines, check dating machines, other check protector machine devices, computing machines, coin counters, dictographs, dictating machine record shaving machines, duplicating machines, embossing machines, envelope opening machines, erasing machines, folding machines, fanfold machines, fare registers, fare boxes, listing machines, line-a-time and similar machines, mailing machines, multigraph type justifying machines, numbering machines, pencil sharpeners, postal permit mailing machines,_ punch card machines, sorting machines, stencil cutting machines, shorthand writing machines, sealing, machines, tabulating machines, ticket counting machines, ticket issuing machines, typewriters, transcribing machines, time recording devices, and combinations of any of the foregoing, 10 per centum.
[26 TJ.S.C. 1952 ed., Sec. 3406.]
*424 Internal Kevenue Code of 1954, Subcbapter E, Part I, Business Machines:
Sec. 4191. ImpositioN op Tax.
There is hereby imposed upon the sale by the manufacturer, producer, or importer of the following articles (including in each case parts or accessories of such articles sold on or in connection therewith, or with the sale thereof), a tax equivalent to 10 percent of the price for which so sold:
Adding Machines
Addressing machines
Autographic registers
Bank proof machines
Billing machines
Bookkeeping machines
Calculating machines
Card punch machines
Cash registers
Change making machines
Check writing, signing, canceling, perforating, cutting, and dating machines and other check protector machine devices
Computing machines
Coin counters
Dictagraphs
Dictating machines
Dictating machine record shaving machines
Duplicating machines
Embossing machines
Envelope opening machines
Erasing machines
Folding machines
Fanfold machines
Fare registers and boxes
[26 U.S.C. 1958 ed., Sec. 4191.]
Listing machines
Line-a-time and similar machines
Mailing machines
Multigraph machines, typesetting machines and type justifying machines
Numbering machines
Portable paper fastening machines
Payroll machines
Pencil sharpeners
Postal permit mailing machines
Punch card machines
Sorting machines
Stencil cutting machines
Shorthand writing machines
Sealing machines
Tabulating machines
Ticket counting machines
Ticket issuing machines
Typewriters
Transcribing machines
Time recording devices
Combinations of any of the foregoing.
It is the Government’s contention that these machines are store and business machines, i.e., “duplicating machines” which were properly subject to the tax. The plaintiffs take the position that said machines are printing presses and not duplicating machines.
*425 It is plaintiffs’ view of the case that once we have classified these machines as either printing presses or “duplicating machines”, such classification determines whether or not the excise tax is applicable. Or, to put it another way, if we should find these machines to be printing presses, it necessarily follows that they were not subject to the excise tax. In oral argument and in their brief plaintiffs stress that the case was tried on a stipulated issue: “* * * whether or not the machines manufactured and sold by the plaintiffs during the periods covered by the claims under consideration (February 1950-March 1959) were store and business machines, i.e., “duplicating machines” within the meaning of Section 3406'(a) (6), Internal Revenue Code (1939) and its counterpart, Section 4191, Internal Revenue Code (1954), as the defendant contends, or whether they are printing presses, as plaintiffs contend, which are not subject to the tax under the foregoing Sections.” It is apparent from a reading of the statutes that “duplicating machines” are subject to the tax; however, the statutory interpretation of whether specific machines come within that category is the province of the court and cannot be disposed of by stipulation of the parties.
We adopt the Commissioner’s fact findings with slight modifications. In summary, they are as follows:
From its incorporation in 1916 until approximately 1940, Davidson manufactured and sold paper-feeding devices which were invented by its founder, William Ward Davidson, Senior. Between 1924 and 1940 these feeders were purchased by the American Multigraph Corporation and its successor, Addressograph-Multigraph Corporation, for incorporation in their Multigraph Machines. In the latter five years of the above period, over 97 percent of all Davidson’s sales were made to Addressograph-Multigraph Corporation, of which the Friction Feeder and the Suction Feeder were the dominant products.
During the mid-1930’s, Davidson performed development work on a variety of products, one of which was a small rotary printing machine which it planned to market primarily as a business or office machine in business concerns which required a substantial amount of reproduction work. This intention is found in the registration statement, as *426 amended, which Davidson filed with the Securities and Exchange Commission in 1939, in connection with issues of common stock, in which statement Davidson indicated the machine would probably be called the “Davidson Duplicator.” A subsequent statement filed by Davidson in 1940, in which were repeated references to its “duplicators”, indicated that the “Davidson Duplicator” was practically ready for production.
In 1940 Davidson marketed its Model 221 under the name of “Davidson Dual Duplicator,” thereby professing the two-purpose nature of the machine — lithographic and letterpress. This machine could print on paper ranging in size from 3 by 5 inches to 10 by 14 inches, and provided reproduction either from offset plates or from type, electrotypes, rubber plates, etc., as distinguished from stencil or liquid duplicators or machines of the hectograph type. The advertisements of the 221 not only pointed out these characteristics, but stressed the advantage of offset duplication for office use, where office forms, stationery, form letters and advertising literature were used to any great extent, and the relative simplicity of operating the machine.
Priorities created by the war emergency restricted the market to the extent that the Federal Government became Davidson’s most potential customer, but only for sale of “duplicating machines”. As all Government printing was required to be done by the Government Printing Office, the purchase of printing presses was restricted, but the various departments and agencies could purchase machines commonly considered as doing “duplicating” work of the kind frequently performed in businesses and offices for relatively short run reproduction. Thus Davidson during the war years strongly emphasized that its 221 was a “duplicator” for office use.
Davidson continued to seek the office market in the years following the war and after its 1950 merger with Mergen-thaler. The development and marketing of the de luxe Model 251 was accomplished after the merger, which model was designed primarily to eliminate noise and exposed parts, which were objectionable in the 221.
*427 While Davidson was characterizing its machines as “duplicators” and for a period of time thereafter, none of its advertising appeared in the various printing trade media. It did appear, however, in such office equipment publications as “The Office Management and Equipment Purchasing Guide,” which listed Davidson’s machines under “Machines, Duplicating, Offset.” Other publications carrying Davidson advertising were “Office Appliance Buyers Guide”, “Time Magazine”, “The Office”, “Nation’s Business”, “American Business” and “Business Week.”
Shortly after the merger, Mergenthaler realized the vast possibilities of the Davidson machines in the arts field, with their capacity to produce work comparable to larger and more complex conventional printing presses, and directed its sales activities in this direction, as well as toward the office equipment field and those businesses which operated their own printing shops (commonly called “captive printing shops”). To implement this effort toward increasing sales in the commercial printing field, the word “Duplicator” was dropped, and the machines were advertised as “Davidson Dual.”
During the 1950-1954 period, Davidson’s advertising material pertaining to Model 221 and the larger Model 233 was as follows:
Letterheads — Labels — Envelopes — Bulletins — Office Forms — Advertising Folders — Price lists — Form letters — Post cards — Announcements. Print them all on a Davidson Dual.
Advertising referring only to its small Model 241 (221)[2]:
(1) Only Davidson gives you both offset and letterpress printing and duplicating. You won’t find a more versatile press anywhere than Model 241. * * * It’s easy to see why the Standard Davidson Dual can turn out fine printing and duplicating at high speed and low cost.
Advertising that referred only to Model 251[3]:
New streamline design finished in handsome Davidson grey.
_ It’s a handsome piece of equipment, this sleek, streamlined business machine [italics ours] with its rich grey *428 finish. * * * You’ll find this new model considerably more quiet running.
Both Printing and Duplicating — The Davidson Dual is the ideal press for turning out long or short runs of such things as letterheads, envelopes, advertising literature, labels, office forms, * * * and a host of other small printed matter. Then, in addition, the Davidson Dual does the very finest duplicating [italics ours] * * * form letters, sales bulletins, bills of material, engineering drawings, reports, publicity releases, maps, charts etc. Anything that can be typed, written, ruled or drawn can be reproduced quickly * * * a few copies or thousands * * * using low cost paper masters * * * every copy from first to last is an exact duplicate of the original.
In 1954 the name of the machines was changed to “Davidson Dual-Lith” which name is presently used. The sales literature after 1954 for Models 241 (221) and 233, the latter of which is essentially the same as 241 except that it is larger and more rugged, continued to stress the ease and simplicity of operation to promote their utility in the business office market. A typical excerpt is as follows:
Q. Can anyone use the Davidson Dual-Lith ?
A. The precision engineering and sturdy construction of the Davidson Dual-Lith have made it appeal to printers, of course, but these same features, together with its simplicity and ease of operation, make it the preferred small offset equipment for business, for office applications, for Government and for schools as well. The Davidson Dual-Lith is the ideal general purpose small offset machine for both short and long runs.
Plaintiffs’ advertising of the above nature appeared in such publications as “Graphic Arts Monthly,” “The Office,” “Nation’s Business,” “American Business,” “Time Magazine,” “Burroughs Clearing House,” “Editor and Publisher,” “Inland Printer,” “American Printer,” and “Business Week.”
The foregoing relates how plaintiffs characterized their machines up through the last of the years in question. We shall now relate plaintiffs’ dealings with the Bureau of Internal Revenue relative to the taxability of these machines.
In August 1945, Craftsman Press, Inc., a commercial printing establishment which was a prospective purchaser of Davidson Model 221, sought a ruling as to the applicability of the excise tax to this machine, as equipped for offset work. *429 The Deputy Commissioner of Internal Eevenue ruled tbat tbe machine was subject to the tax, stating that the “inherent characteristics” of a machine was the determining factor of taxability — not the “use to which the machine may be put after the sale.”
During all the years in controversy here (1950-1959) the excise tax on these machines was paid. However, in 1950 Davidson had requested a ruling on the taxability of its tandem Model 225. Basing its decision on the description and specifications as set out in the request letter, which stated that “the machines are designed for and will be sold to the graphic arts industry and they are used by printers or companies owning printing shops,” the Bureau of Internal Eevenue ruled that the machines were not subject to the excise tax. In 1952, the Bureau revoked this ruling, holding the machines taxable. This new ruling was based upon a report from an internal revenue field agent who found the tandem Model 225 as having the same general specifications and being adaptable to the same operations as the Model 221 “which is taxable.” By letter dated February 28, 1952, the Deputy Commissioner also held Model 233 to be subject to the excise tax.[4]
In 1951 Davidson filed a claim for refund in the amount of $7,958.86 with respect to its tandem Model 225, covering the period between February 28, 1950, and November 30, 1950'. This claim was rejected both because the Commissioner had ruled on February 28, 1952, that the machines were taxable and for lack of compliance with section 3443 (d) of the Code, which requires that a person establish his claim by alternative methods, one of which is by procuring customer consent. On May 4,1954, Davidson filed an amended claim for $4,346.80 based upon those customer consents which it had been able to obtain. Three days later Davidson filed a petition in this court for $4,346.80, the amount of the amended claim. The Commissioner has not ruled on the amended claim.
On August 28,1956, Davidson filed a claim for refund on Models 225, 221, 241, and 233. Shortly before filing, Davidson and Merganthaler had joined in a request to Internal *430 Eevenue Service for reconsideration of the rulings on Models 225 and 233, and asked for a ruling- on Davidson’s other Dual-Lith models. This was Davidson’s first attempt to have its Model 221 (241) declared tax exempt.
In 1957 both Davidson and Mergenthaler filed individual claims for refund with respect to the manufacturers’ excise taxes which each had paid on Models 223, 224, 225, 241, 251, and 233. Again they jointly requested reconsideration of the taxability of Models 225 and 233, as well as a ruling on Models 221, 223, 227, 237, 241, 242 and 251. The Internal Eevenue Service refused to make any further ruling on the Davidson machines until the question of the taxability of the tandem Model 225, pending before the Court of Claims, had been decided.
On December 16, 1958, Davidson filed its petition in this court for $73,495.07 covering its 1956 and 1957 claims for refund. On February 16,1959, Mergenthaler filed its petition in this court for $225,164.99 covering its 1957 and 1958 claims for refund.
The Government concedes that the manufacturers’ excise tax does not apply to any type of printing machine or press which, considering the quality of work performed, its construction, size, weight, required skill of operation, price, and the market sought, is normally associated with commercial print shop operations. However, the Government’s position in regard to the machines in issue is that they are not commercial printing presses, but are duplicating machines within the meaning of the statutes. The plaintiffs maintain that the machines are printing presses which are not subject to the tax.
In the commercial world it is usually unnecessary to distinguish between “printing” and “duplicating,” and the terms are frequently used interchangeably. Generically, any multiple reproduction process is a type of duplicating process.
In the trade, however, certain types of processes are commonly referred to as “duplicating” and the machines performing such processes are generally known as “duplicators.” Such machines are considered to be types of business or office machines which are used principally for internal short run *431 work. Consequently, manufacturers appealing to the “office market” tend to advertise their machines as “duplicators.”
Originally, the machines most commonly falling into this category were those employing stencil and spirit processes, such as the mimeograph and ditto machines. The products of these machines are readily distinguishable from the products of the printing process, whether letterpress or offset, by the quality of work performed and the types of ink and paper used. However, in recent years the manufacturers of stencil and spirit process duplicators have also developed machines to perform offset reproduction with a variety of plates, including paper plates on which the image can be prepared by a regular typewriter. The product from these machines is indistinguishable from the product of “printing presses” performing offset reproduction by the same method. Since, for relatively short run work, there is wide use of the paper plates on which the image may be produced directly with a typewriter or by other direct application, the trade frequently considers the use of the offset principle with direct image paper masters as within the duplicating category, and the process is known as “offset duplicating.”
On the other hand, a great deal o.f long run work by commercial printing shops is accomplished by offset lithography with reverse image photomechanical negatives or plates. Such process is normally not considered by the trade as “duplicating”. This process is now employed for much of the work that was previously done by letterpress.
The evidence amply illustrates that the Davidson machines, while employing one process, are capable of performing work indistinguishable from work done by commercial printing presses; however, these machines, while employing another process, are also capable of performing work indistinguishable from that done by machines classed by the trade as duplicators. We would seem to be left with a hybrid machine, which is both a printing press and a duplicator. It appears that this is the inventor’s conception of his machine. In 1941, in his application for a patent on a “Printing Press”, Mr. Davidson stated, in part:
The subject matter of this invention is a two-purpose duplicator capable of doing both direct and offset print *432 ing. For direct printing, the raised type, or so-called “letterpress” process, is ordinarily used; and for offset printing^ the lithographic process is preferred.
Most, if not all, duplicators on the market before this invention were one-purpose machines. They could do either letterpress printing, directly from a raised type plate to the sheet being printed, or they could do offset lithographic work in which the positive image on the lithographic plate is first transferred to a rubber blanket and then to the sheet being printed. They cannot, however, do both direct and offset printing. _
_ The offset lithographic process is rapidly displacing direct letterpress printing for reasons unimportant here, but there are some printing jobs which, by reason of inherent limitations in the lithographic process, or because of cost, are almost necessarily performed by the letterpress process. Printing just a few words in a blank left in previously printed pamphlets, cartons, and the like is one such instance. This is called “imprinting.”
Large printing shops can afford to have both lithographic presses and letterpress machines, but there is a large demand in smaller printing establishments, and in stores, manufacturing plants, business houses, and the like, for a single, relatively small, moderately priced duplicator capable of doing quality printing by either the letterpress or lithographic processes.
A two-purpose duplicator designed for and used largely in this specialized field will, in most instances, be operated by persons skilled only slightly, if at all, in the printing field, and hence one of the paramount objects of the invention is to so organize, construct, and arrange the essential elements and mechanisms of the machine that it is characterized by simplicity, ease of adjustment, convenience of operation, and the speed by which it can be converted from a direct printing letterpress machine to an offset lithographic machine, and vice versa.
To achieve the broad objects of a two-purpose machine, the conventional employment of three printing cylinders is discarded, and, instead, only two cylinders are used, one being larger than the other and preferably having a diameter that is twice that of the smaller cylinder. The larger cylinder or drum is provided with removable plate and platen segments, while the smaller drum carries a blanket. When the machine is used for lithographic offset printing, a plate is mounted on the plate segment, and during one-half the revolution of the large drum the image is transferred to the blanket, *433 and during the next half revolution of the large drum the blanket transfers the image to the sheet being printed.
To convert the machine into a direct printing letterpress duplicator, the platen segment is removed, and in its place a direct printing letterpress segment is substituted. * * * [Italics ours.]
The excise tax statutes under both the 1939 and the 1954 Code do not expressly name nor do they expressly exclude “printing presses.” The specific heading under the 1939 Code is “Business and store machines,” while under the 1954 Code the heading is simply “Business Machines.” Each is followed by listings in general categories of types of machines which are commonly found in a business office or store, and are designed for use therein, although many of them are also used extensively elsewhere. It is our interpretation of the statutes that Congress intended to include all machines designed for and generally used in a business office or store. We feel that, regardless of whether a machine is called a “small printing press” or a “duplicator”, any machine which employs a duplicating process which is of primary import, and which is designed for and used in a business office or store, is properly classified as a duplicator within the purview of the excise tax statutes and subject to the tax. There is little doubt that the Davidson machines meet this test.
The statements filed with the Securities and Exchange Commission and the various patent descriptions on the “Printing Presses” explicitly state that Davidson’s intention was to design a printing machine for use in business offices and stores. He carefully explained the simplicity of operation, the high speed and quality of the work product, and the cost which was low enough to make its use by business offices economical.
The advertisements and the periodicals in which they appeared bear out the conclusion that Davidson sought the business machine market. For ten years the machines carried the name “Davidson Dual Duplicator” and the advertisements appeared only in trade publications and the office equipment trade media. While in 1950 Davidson dropped the name “Duplicator” and its advertisements appeared in *434 periodicals of the graphic arts industry, they continued to be published in the business and office equipment publications. It was after the 1950 merger with Merganthaler that the de luxe Model 251 was produced and marketed. It was advertised to stress the quietness of the machine and the handsome grey finishing, such characteristics being very significant in a business office machine, though of little consequence in the commercial printing industry.
That Davidson was successful in the office machine market is evident from the sales statistics taken from Davidson’s own records. Likewise, in a letter dated December 4, 1951, wherein Davidson requested a ruling from the Internal Revenue Service (then called the Bureau of Internal Revenue) as to the taxability of its Model 233, Davidson made the following statement:
With respect to the Davidson Dual Model 221 tax has been collected and paid on all sales of this model, since a considerable portion of the sales of this machine have been for use as office equipment. However? no ruling has ever been specifically requested nor obtained with respect to this model. In like manner and for similar reasons, we have collected and paid tax on all sales of the Model 251 Davidson Dual.
The mere changing of a name, while the basic nature of the machine remains unchanged, is inconsequential. By the time Davidson dropped the name “Duplicator” in 1950 and advertised its machines, first as “Davidson Dual” and later as “Davidson Dual-Lith”, it was well established in the business machine field.
The Davidson Model 221 (241) and Model 233 are the basic machines. The other models, bearing different numbers, are derivatives or variations of the basic models. The Model 233, sold by Davidson in 1952, is essentially the same as Model 221 (241) except that it is a larger and more rugged machine which will accept paper up to size 14 by 17% inches.
The fact that this particular model or any of the others are being sold to commercial printers as well as to the office equipment market has no relevant bearing on the issue. The statutes do not require that the machines have but a single purpose and utility.
*435 The question presented to us in this case has not been presented to us before and, so far as we have been able to ascertain, to any other court. While the machine was capable of doing the work of a printing press, it undoubtedly was designed for use and was capable of being used as an ordinary duplicating machine. If so, it is subject to the tax.
It is, therefore, our determination that the excise tax paid by plaintiffs on the Davidson machines in issue was proper, and plaintiffs’ claims for refund thereon are denied.
Plaintiffs’ petitions will, accordingly, be dismissed with prejudice.
Davis, Judge; Durpee, Judge; Laramore, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Saul Eichard Gamer, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff Davidson Corporation was incorporated under the laws of the State of Illinois. Its present principal place of business is at 29 Eyerson Street, Brooklyn, New York, which is also the location of plaintiff Mergenthaler Linotype Company. In 1950, it became the successor to the business of the Davidson Manufacturing Corporation, incorporated in 1938 under the laws of the State of Illinois, and which corporation in turn was the successor to the business of the Davidson Manufacturing Company, which was incorporated under the laws of the State of Wisconsin in 1916, and, in 1918, moved its principal place of business from Madison, Wisconsin, to Chicago, Illinois. These three Davidson entities will sometimes hereinafter for convenience be referred to simply as “Davidson.”
2. Mergenthaler Linotype Company (hereinafter referred to as “Mergenthaler”) is a corporation organized in 1895 under the laws of the State of New York, with its present place of business at 29 Eyerson Street, Brooklyn, New York.
On June 30, 1950, Davidson Corporation, as a result of the sale of all of its capital stock to Mergenthaler, became a wholly owned subsidiary of Mergenthaler. Incidental to *436 this transaction, the Davidson Manufacturing Corporation changed its name on June 30,1950, to the Chicago Duplicator Company which company, on the same day, transferred all of its assets to Davidson Corporation.
In 1953, Davidson moved its offices and manufacturing plant from Chicago to the offices and plant of Mergenthaler in Brooklyn, and thereafter Mergenthaler manufactured the products formerly manufactured and sold by Davidson, with Davidson continuing as a sales subsidiary of its parent. The controversy involved herein concerns certain Davidson machines manufactured prior to 1953 by Davidson and thereafter by Mergenthaler but still sold under the Davidson name.
3. (a) Davidson was originally founded by one William Ward Davidson, Sr. For a period of time, it manufactured and sold a device, invented by its founder, called the Faster-feed. The device, known as an “automatic typewriter feeder”, automatically fed envelopes, cards and paper into typewriters. The principles of this feeder were later adapted to an automatic feeder for use on small printing presses, this device being known as the Auto-Feed. Later, Davidson developed an improved type of feeder, known as a Pile Friction Feeder, which had a greater holding capacity and made possible, by means of a frictional process, a more accurate sheet separation as the sheets were fed into the machines to which the feeders were attached. In 1924, the American Multigraph Company commenced purchasing these feeders for incorporation in its “Multigraph” machines, and this relationship was continued by its successor, the Address-ograph-Multigraph Corporation. Around 1928, to meet a demand among Multigraph users for a so-called Suction Feeder, Davidson developed such a device. Although developed in response to the demands of Multigraph users, the device could also be used on other types of machines to which paper was to be fed, such as printing presses and folding machines. This suction feeder automatically prevented the delivery to the machine of more than one sheet at a time without stopping the machine or the feeder. A device called a “Continuous Load Feeder” was also developed whereby additional supplies of paper stock could be loaded on the feeder *437 while in continuous operation. In addition, Davidson also devised a special feeder for use with the Addressograph-Multigraph Corporation’s “Addressograph” machines, this device being manufactured, however, by said corporation under a license agreement with Davidson. From around 1935 to 1940, over 97 percent of Davidson’s sales were made to the Addressograph-Multigraph Corporation. The principal products sold to this primary customer were the Friction Feeder and the Suction Feeder.
(b) In the mid-1930’s, Davidson also developed and sold a Paper Folding Machine which applied new principles in the automatic folding of paper. This machine had special application to the printing field. However, it was also applicable to the preparation of such materials as advertising matter and bulletins where many kinds of folds are desired. The various Davidson Feeders could be attached to the Paper Folding Machine.
(c) During this period, Davidson also performed developmental work on a variety of other products, such as a so-called Collating Machine, designed to do automatically the collating of papers usually done by a number of operators seated around a revolving table on which the various piles of paper are placed and from which each operator withdraws the various sheets to be assembled as the piles revolve; a Rotary Pump, for use in air conditioning and commercial refrigeration units; and a small rotary printing machine which it then called the “Davidson Duplicator”, and which it planned to market, principally as a business or office machine, to business concerns which required a substantial amount of reproduction work.
Of these development products, the only one Davidson carried through to successful marketing was said small printing machine, which machine is the subject of the controversy herein.
(d) Up to the time Davidson was purchased by and became a wholly owned subsidiary of Mergenthaler, it was dominated and controlled by said Davidson, Senior, who was its president, the owner of more than half of its stock, and the inventor or co-inventor of the various Davidson products hereinabove mentioned.
*438 4. In 1939 and 1940, Davidson found it necessary to raise additional capital and, on June 7, 1939 (as amended on June 23, 1939), and on June 10, 1940, filed Registration Statements with the Securities and Exchange Commission in connection with issues of common stock.
The amendment of June 23, 1939, stated, among other things:
In addition to the products described above, additional products of a related or similar nature to those described are being developed, including what will probably be called the Davidson Duplicator which, it is anticipated, will be received favorably by concerns whose business requires a rather substantial amount of printing. Numerous patent applications have been filed for covering the Duplicator itself and the various supply items necessary to its operation.
* * * The present plans of the company are to continue the manufacture and sale of the Suction Feeders and the Continuous Load Feeders, and to commence the greduction at an early date of the Folding Machines, ollating Machines, Rotary Pumps, and Duplicators, and parts and supplies to be used in connection with the operation of such products.
The Statement of June 10,1940, stated, among other things:
* * * The Davidson Duplicator is practically ready for production.
Some of the products, particularly the Davidson Duplicator, which the company plans to manufacture in the future, will in all probability be competitive products to those now being manufactured and sold by the Addressograph-Multigraph Corporation. If the company adopts a policy of selling such products in competition with the products of the Addressograph-Multigraph Corporation, the percentage of gross sales to the Addressograph-Multigraph Corporation will in all probability be reduced and such sales conceivably might be eliminated entirely. The company does not have any present intention of discontinuing the sale of its Feeders to the Addressograph-Multigraph Corporation in the future, and to date the company has received no notice from the Addressograph-Multigraph Corporation as to whether or not it will continue to purchase *439 Feeders or other products from the company in the future.
:S :fc * Ü: *
The present intention of the company is to create and obtain its own sales organization and sales outlets, and to market its Suction Feeders, its Folding Machines and its Duplicators, together with replacement parts for all such equipment and together with supplies for the Davidson Duplicators, through such sales organization and sales outlets. * * *
* * * The company has adequate facilities for the manufacture and production of a substantial portion of the parts used in the manufacture of the various types, kinds, sizes and models of Feeders, and for a substantial portion of the parts which will be used in the various types, kinds, sizes and models of the Folding Machines and the Davidson Duplicators. * * *
❖ H* ❖ # H*
The company anticipates that, at such time as it succeeds in producing the Davidson Folding Machine and the Davidson Duplicator in quantities, together with the supplies to be used in connection with the Davidson Duplicator, its manufacturing operations may expand rather rapidly, with the result that the company may require additional space for its manufacturing operations. * * *
5. (a) In the 1930’s, the 1940’s, and the 1950’s, Davidson, Senior, as inventor or co-inventor, applied for and was granted a number of patents on printing presses and related devices and attachments. Set forth below are excerpts from some of these patents which are relevant to the issues herein.
(b) On September 18, 1937, application was made for a patent on “Feeding and Registering Apparatus.” The patent (No. 2,246,508) was granted on June 24, 1941. The patent description stated in part:
This invention relates to feeding apparatus for feeding sheets to any mechanism in which the position of the sheet must be accurately registered with the position of the mechanism. Since the most common instance of the need for accurate registry in sheet feeding is in connection with printing presses, the invention illustrated and described in that relation and further references to other uses may be omitted for the sake of simplicity. *440 However, the term, “printing presses” may be taken as including related machines such as duplicators.
(c) On August 31,1938, application was made for a patent on a “Stripping Mechanism for Printing Presses.” The patent (No. 2,211,765) was granted on August 20,1940. The patent description stated in part:
An object of the invention is to provide a simple type of stripping mechanism which is capable of stripping sheets from the printing drum of a printing press without the aid of grip fingers or other mechanism mounted on and rotating with either of the printing rolls. The invention is particularly useful in offset printing machines because the blanket roll used in such printing has great affinity for the sheets. However, the invention may be used anywhere stripping is required. Since its chief use is on printing presses, it will be described only with reference to such use. The term “printing presses” should be understood as including duplicators known more commonly under other names.
(d) On May 5,1939, application was made for a patent on a “Printing Press.” The patent (No. 2,306,044) was granted on December 22,1942. The patent description stated in part:
The present invention relates to new and useful features in the construction and general assembly of rotary printing presses and to certain new and useful improvements which have a broader application to presses generally.
It is one of the objects of the invention to provide a printing press which can be used in general business offices whose employees are not skilled in the art of printing, yet satisfies the requirements of printers generally and can be used in printing plants for light and fast work.
In providing such a press, the question of price range is of prime importance. Many of the improvements developed in recent years amount to nothing more than accessories added to otherwise old presses and the cost of a particular installation was indexed by how many additional accessories were required by a purchaser. No substantial reorganization of the press assemblies has been had to eliminate parts and elements conventionally believed necessary. * * *
It is one of the purposes of the present invention to provide a reorganized press construction which accomplishes *441 the results of the larger and more complicated conventional presses and which can be furnished at a single price within that which general business offices would be willing to pay to have an installation made to take care of their light work.
In providing a press that can be operated successfully by employees in general business offices it is important that the press be fool-proof for unskilled labor. Simplicity and ruggedness make it possible to accomplish this, and in the present invention these features have been emphasized. On the other hand these features make the present press desirable for use in printing shops and although the press of the present invention is already a high speed press within the meaning of these words in the art, its low cost enables work speeds to be multiplied in relation to equipment overhead since two or more of the present presses may be installed within a budget normally allocated for a single conventional press. This enables a multiplication of work to be turned out on the same overhead.
Not only this, but the press of the present invention performs work acceptable to printers and the discriminating public alike, within the standards and criterion that have come to be expected of a printing process. In the present invention the process is preferably lithographic although the press illustrated is designed, with little change, to operate as a direct or type printing press, within the purposes and objects of the invention.
In addition to these features, I provide an improved rotary press having only two cylinders in the printing couple, * * *.
Similar statements were made in an application made December 7,1942, for a patent on a “Printing Press” which was granted (No. 2,427,904) on September 23, 1947.
(e) On May 24, 1941, application was made for a patent on a “Printing Press.” The patent (No. 2,358,284) was granted on September 12, 1944. The patent description stated in part:
The two-cylinder two-purpose printing presses recently placed on the market by the Davidson Manufacturing Corporation under the trademark “Dual Duplicator” have been received with exceptional favor, but it is nevertheless desirable to provide a press of this general nature which can be sold in a lower price class, which will do a satisfactory printing job and which will *442 be reasonably convenient to use, even though it does not have all the advantages of the press which has been so favorably received. An important object of the present invention, therefore, is to provide a cheaper press which will print satisfactorily and conveniently either by direct letter-press printing, by which is meant printing from raised inked surfaces such as type, or offset plano-graphic printing, by which is meant printing from a smooth planographic surface onto a transfer blanket and from it onto the sheet to be printed.
One of the features of the invention which is important in respect to economy and convenience is in providing an inexpensive construction in which prints produced by either direct or offset printing can be delivered right-side-up for inspection. * * *
(f) On August 11, 1941, application was made for a patent on a “Printing Press.” The patent (No. 2,387,750) was granted on October 30, 1945. The patent description stated in part:
The subject matter of this invention is a two-purpose duplicator capable of doing both direct and offset printing. For direct printing, the raised type, or so-called “letterpress” process, is ordinarily used; and for offset printing, the lithographic process is preferred.
Most, if not all, duplicators on the market before this invention were one-purpose machines. They could do either letterpress printing, directly from a raised type plate to the sheet being printed, or they could do offset lithographic work in which the positive image on the lithographic plate is first transferred to a rubber blanket and then to the sheet being printed. They cannot, however, do both direct and offset printing.
The offset lithographic process is rapidly displacing direct letterpress printing for reasons unimportant here, but there are some printing jobs which, by reason of inherent limitations in the lithographic process, or because of cost, are almost necessarily performed by the letterpress process. Printing just a few words in a blank left in previously printed pamphlets, cartons, and the like is one such instance. This is called “imprinting.”
Large printing shops can afford to have both lithographic presses and letterpress machines, but there is a large demand in smaller printing establishments, and in stores, manufacturing plants, business houses, and the like, for a single, relatively small, moderately priced *443 duplicator capable of doing quality printing by either the letterpress or lithographic processes.
A two-purpose duplicator designed for and used largely in this specialized field will, in most instances, be operated by persons skilled only slightly, if at all, in the printing field, and hence one of the paramount objects of the invention is to so organize, construct, and arrange the essential elements and mechanisms of the machine that it is characterized by simplicity, ease of adjustment, convenience of operation, and the speed by which it can be converted from a direct printing letterpress machine to an offset lithographic machine, and vice versa.
To achieve the broad objects of a two-purpose machine, the conventional employment of three printing cylinders is discarded, and, instead, only two cylinders are used, one being larger than the other and preferably having a diameter that is twice that of the smaller cylinder. The larger cylinder or drum is provided with removable plate and platen segments, while the smaller drum carries a blanket. When the machine is used for lithographic offset printing, a plate is mounted on the plate segment, and during one-half the revolution of the large drum the image is transferred to the blanket, and during the next half revolution of the large drum the blanket transfers the image to the sheet being printed.
To convert the machine into a direct printing letterpress duplicator, the platen segment is removed, and in its place a direct printing letterpress segment is substituted. * * *
Similar statements were made in an application made on January 22,1945, for a patent on a “Sheet Detector Control Mechanism for Printing Presses,” which was granted (No. 2,539,382) on January 30,1951.
6. (a) Most printing is performed by three methods, (1) relief, also called letterpress, (2) gravure, also referred to as intaglio, and (3) lithography, also called planography, and commonly referred to as “offset”.
(b) Eelief or letterpress printing, the oldest form of printing, is the method whereby the image to be printed is raised in relief so that only that portion which is to print touches an external ink source, such as ink rollers. Print *444 ing by letterpress may be done from various media, such as rubber plates, constituting type raised in rubber (similar to a rubber office stamp), electrotypes, constituting curved metal plates with raised images, loose or foundry type set by hand, and Linotype slugs. The inked character or image is pressed directly onto paper under pressure. Two forms of letterpress machines are the flat bed and the rotary. Gutenberg is generally credited with the invention of movable type. Prior to 1886, all type had been set by hand. In that year, one Ottmar Mergenthaler invented a mechanical line casting machine, causing individual type characters to be cast together automatically to form a line of type, thus giving rise to the trade name Linotype. This was a revolutionary invention in the graphic arts or printing industry, and has made the Mergenthaler Linotype Company, founded in 1895 to exploit, the Linotype, the dominant factor in the field.
(c) Gravure, the youngest form of printing, is the opposite of letterpress. Instead of the image being raised, it is depressed or etched into a printing plate and the entire plate covered with ink. The surface of the plate is then wiped clean leaving the depression filled with ink. When the sheet of paper is pressed against the plate, the ink in the depression appears on the sheet.
(d) Lithography or planography (printing from a plane surface) is different from letterpress and gravure in that the image to be printed is neither raised nor depressed. Instead, the image is on the surface of a printing plate. In lithography the separation between image and non-image areas is maintained chemically on a flat or plano-graphic plate. Based on the principle that grease and water do not mix, a greasy image is placed on the plate. The plate is then moistened, the greasy image, however, rejecting the moisture. Greasy (“printer’s”) ink from an external source is then applied to the plate. The moistened non-image area rejects the ink, but the greasy image area accepts it, The image is then transferred to the paper when the plate is pressed against it.
For the most part, modern- lithography uses thin plates, commonly made of plastic or of such metal materials as zinc *445 or aluminum. Paper plates have now replaced metal plates for many purposes, particularly when a lesser number of copies are required.
The above description involves a direct transfer of the image to the paper (direct lithography). 'A modern development consists of first transferring the image to a rubber blanket or cylinder which, in turn, transfers or “offsets” the image to the paper (offset lithography.) It was found that this method produced an image of finer quality.
Since so much lithography is presently accomplished by the, “offset” method, the term “offset” is frequently used synonymously with “lithography.”
The lithographic principle was invented in 1798 by one Aloys Senenfelder, a German' inventor. It originally involved placing, with a greasy material (crayon), a reverse image on a limestone surface having hydrophilic properties. The entire surface was then flushed with water and rolled over with a greasy ink, the greasy area receiving the greasy ink while the remainder of the surface, so flushed, repelled the ink. The reverse (mirror) reading image on the stone was transferred to paper by pressing the paper to the stone so as to produce a forward reading image on the paper. •
,7- Modem lithography is generally accomplished in one of two ways, by use of (a) photographic offset plates, or (b) paper masters.
In 1955, Davidson published a booklet describing printing in general, particularly lithography, as well as the Davidson machines herein involved. In this publication, entitled “Offset Reproduction and the Davidson Dual”, Davidson describes the photographic offset plate process as follows:
THE PHOTOGRAPHIC OFESET PLATE
The photographic offset plate consists of a thin piece of metal or plastic, the face of which has been coated with a water-soluble, light-sensitive material.'
. The first step in the preparation of this plate is to photograph the printed or illustrated matter which is to be printed. This produces a negative which is placed over the unexposed, coated plate. The plate and negative are held together tightly in a pressure frame while being exposed to a strong light. Light hardens the .coat *446 ing behind the transparent area of the film, rendering it insoluble in water. This hardened coating now becomes the image base. Next, the plate is covered with a grease-base developing ink, which clings only to the hardened image base. The unhardened coating is then washed away with water.
The lithographic press is equipped to supply both moisture and ink in the proper quantities to the plate, the surface of which has been prepared to accept these two elements in the proper areas: that is, moisture in the non-image areas and ink in the image areas.
The ink and moisture are transferred by several rollers until they are reduced to a thin, even film which is applied to the plate by the form rollers.
As the press revolves, the dampening form roller is the first to contact the plate. As it rolls across the entire plate surface, moisture is transferred to the non-image, or bare plate areas. Because grease and water will not mix, the grease-like image areas repel the moisture and remain dry.
Immediately after dampening, the plate surface is contacted by the ink form rollers. Again, because grease and water will not mix, none of the grease-base ink will transfer to the moistened, non-image areas of the plate. These areas remain clean. However, the image, having remained dry, has an affinity for the ink which it readily accepts from the ink rollers. Each revolution of the press re-moistens the non-image areas and replenishes the ink to the image. This is how a separation is chemically maintained on the lithographic plate.
This booklet also describes the use of paper masters as follows:
PARER MASTERS (DIRECT IMAGE)
Paper masters are used in much the same fashion as the photographically prepared metal or plastic offset plate. The difference lies. in how the image is put on the. plate. Instead of using a light-sensitive coating which is hardened by light to become the image, a paper master is a specially treated, paper plate and is prepared by a technique called “direct image.” The image is drawn or typed directly on the smooth surface of the paper master with a grease-base crayon, ink or typewriter ribbon which repels moisture. The non-image areas of plate surface accept moisture quite readily, and hence we see that the necessary chemical separation of the image and non-image is established.
*447 Paper masters are used on short runs and their use is sometimes called “duplicating.” The press when used as such is often called a “duplicator.” Very short runs— of 50 copies or less — are called short run duplicating, or “systems.” Systems duplicating generally requires frequent plate changes with only a few copies from each paper master. Your Davidson may be equipped with a quick change segment to speed the production of short run or systems work. A segment is also available for running other types of plates. It requires only a few minutes to change from one to the other.
8. Commencing about 1935, Davidson, Senior, began intensive research and development work on a small inexpensive rotary printing machine which would have the unique characteristic of not only being capable of doing either letterpress or lithographic printing by an easy and quick method of changing the machine from one type to the other, but also of doing both simultaneously. It would also be unique in providing two cylinders for offset work instead of the conventional three cylinders.
As shown by the patent application of May 5, 1939 (finding 5(d)), it was Davidson’s purpose to develop this small press for use “in general business offices whose employees are not skilled in the art of printing, yet satisfies the requirements of printers generally and can be used in printing plants for light and fast work.”
After a considerable amount of research, Davidson marketed its first machine of this type in 1940 as its Model 221, under the name of “Davidson Dual Duplicator.” The term “Dual” was used to indicate the two-purpose nature of the machine, i.e., lithographic and letterpress. As also stated in said patent, in comparison with other printing machines, the machine is small, light, relatively inexpensive, easy to operate, and is particularly suitable for light printing work. Davidson’s sales efforts were directed primarily toward a business and office market requiring only short runs of material, although the machine could also be considered by a commercial printing shop as a useful one for light work, such as affording a quick and economical means of handling reruns required by reorders. As Davidson stated in its advertising and sales material concerning this machine, “It *448 is actually two machines in one since it will produce both offset and relief duplication.” The material further stated:
The advantages of offset duplication, particularly for office use, have been demonstrated and definitely established during the past few years, and for certain types of work it is by far the most satisfactory method. On the other hand there are many jobs that are most effectively and economically handled by relief duplicating or by a combination of both.
The material emphasized the uniqueness of the machine as follows:
Prior to the invention of the Davidson Dual Duplicator two separate and distinct machines were necessary in order to have available both methods of duplicating. Now, in this one machine the user has his choice — may use the method best suited to the job at hand and enjoy its advantages and economies to the fullest.
The machine was able to print on paper of any size from 3 by 5 inches to 10 by 14 inches. Davidson advertised that within such paper size range, “The Davidson Dual Duplicator has a definite place in any office, store, or other establishment where office forms, stationery, form letters, advertising literature, etc., are used to any great extent.” The advertising and sales material also pointed out that despite its ease of operation, “the Davidson Dual Duplicator is not to be confused with stencil or liquid duplicators or machines of the hectograph type. The Davidson Dual Duplicator provides for reproduction either from offset plates or from type, electrotypes, rubber plates, etc.”
With respect to the ease of operation, the sales literature stated:
Q. Is a professional operator required ?
A. Any person of average mechanical intelligence can be trained to operate the Davidson Dual Duplicator and- within a short time can be expected to produce highly satisfactory results. A technical education and printing experience are not at all necessary.
It also went on to describe how plates are made “for offset duplicating”, either by the use of direct image paper plates *449 which could be typed or drawn upon, or by the use of photographic plates, as well as how “relief duplicating” could be done.
9. (a) Davidson continues to sell this basic machine but with the making of certain refinements it is now marketed as its Model 241. (This machine will sometimes hereinafter for convenience be referred to as “Model 221 (241) ”.) This machine will perform a number of processes. As previously noted, one of the processes it can perform is offset printing, both by the photographic offset plate and by the direct image paper master methods. A variation of the offset metal plate method is the direct metal plate method where the step involving the rubber blanket is eliminated. Printing on one side of the page by the offset lithographic method is accomplished on this machine, as follows:
The process begins by photographing the desired copy to be reproduced and making a negative, or by composing a negative directly on a photocomposing machine. It may also be done by setting type on a Linotype machine, putting the type on a proof press, inking the surface of the type, and “pulling” a reproduction proof which is then photographed and from which a negative is made, which negative is then placed in contact with a sensitized plate (zinc, aluminum, plastic or paper), exposed to a bright light to harden the image, and covered with a developing ink. The plate is then washed with water to remove the soft surface surrounding the hardened grease receptive image, leaving the non-image area as a water receptive hydrophilic surface. The plate for direct lithographic printing is made in the same manner except that it is a mirror or reverse reading image which transfers directly to the paper (which is also true of letterpress) and not, as with the offset plate, a forward reading image.
As noted, the machine has only two cylinders. One cylinder is one-half the diameter of the other. The upper, and larger, cylinder carries two segments: (1) the offset plate segment, and (2) the impression segment. The lower, and smaller, cylinder is covered by a rubber “blanket.” Consequently, it is called the “blanket” cylinder. The machine *450 is thus distinguished from the conventional three-cylinder machine. The inking and dampening of the plate are accomplished in the manner hereinbefore referred to. The inked image is then transferred from the printing plate mounted on the plate segment to the “blanket” on the lower or smaller cylinder, which, because it is one-half the size of the upper cylinder, makes two revolutions to one of the upper, so that on the second revolution the “blanket,” now containing the inked plate’s image, presses against the surface of the paper to be printed at the same time that the paper passes between the blanket cylinder and the impression segment. The paper is thus forced against the inked blanket by the impression segment, thereby causing the image to be transferred to the underside of the paper. The paper is then turned over and delivered with its printed side up.
Simultaneous two-sided lithographic printing, which, as stated, is a unique feature of this machine, is done by removing the impression segment (together with its cams which lift the ink and water rollers from its surface) and replacing this segment with another plate carrying segment. A plate with a mirror (reverse) lithographic image is mounted on this segment. Both this plate (known as a “Direct Lithographic Plate”) and the plate carried by the other plate segment (which has on it a right reading lithographic image and is known as an “Offset Lithographic Plate”) are then dampened and inked by the water and ink rollers as the large cylinder revolves in contact with such rollers. The offset lithographic plate transfers its inked image to the surface of the “blanket” as the blanket cylinder completes one revolution in contact with the “offset” plate segment. Paper is then passed between the blanket cylinder and the “Direct” plate segment as the blanket cylinder completes its second revolution, this time in contact with the Direct Plate Segment. The pressure thus applied transfers the image from the “blanket” surface to the underside of the paper while at the same time transferring the image from the surface of the direct lithographic plate directly to the top side of the paper, thus simultaneously printing both sides of the paper in one operation.
*451 (b) The conventional lithographic “offset” press employs three cylinders of the same size. The first or plate cylinder carries the plate. The second or blanket cylinder carries a “blanket.” The third or impression cylinder presses the paper against the inked blanket cylinder. The first or plate cylinder revolves under two sets of rollers, the dampening rollers which dampen the water-receptive portion of the plate so that the ink will not adhere thereto, and the ink rollers which apply ink to the grease-receptive image. That image, so inked, is then by contact transferred to the second or intermediate cylinder which is covered by a rubber surface called the “blanket.” The paper or other object to be printed is passed between the blanket cylinder and the impression cylinder and is forced against the inked blanket under pressure by the impression cylinder. This causes the inked image which was previously transferred from the plate cylinder to the blanket cylinder to be transferred in turn to the paper or object to be printed. The use of this intermediate or “blanket” cylinder permits the transfer of a right reading image from the plate to the “blanket” (where it appears as a reverse image) and then to the paper as a forward (or right reading) image.
(c) The most widely used lithographic material for direct image work is the paper master, which followed the development of flexible metal plates that could be wrapped around rotary cylinders. It was discovered that paper, more economical than metal, could be successfully coated with a clay substance with properties similar to the limestone used in early lithographic printing. The impetus for developing direct image paper masters was supplied, in part, by the efforts of the manufacturers of stencil and spirit equipment to improve the quality of the work produced by such equipment and overcome existing limitations on the type of paper on which copies could be made with this equipment so as more effectively to compete with printing in certain applications. In recognition of this, manufacturers of printing presses, in turn, made efforts to produce printing presses to perform at the lower levels of skills and more simply (since printing presses were more complicated to operate and required greater skills than those needed to operate stencil *452 and spirit machines) in order more effectively to compete with and to attract more work away from machines of the stencil and spirit type.
The paper master may be prepared for use in the same manner as the metal lithographic offset plate, to which reference has been made above. It can be and is sensitized and exposed to light through a negative or it may be written or drawn on, just as metal plates can. The paper plate has the added advantage over metal, generally, in that a regular typewriter can be used to form the image to be printed. The typewriter ribbon deposits the essential element of lithographic printing (i.e., grease of the kind used in lithographic inks) on the surface of the master. Best results are obtained by using an electric typewriter with a paper carbon ribbon.
A paper plate has a water-receptive surface which is treated either photographically or by direct contact with a greasy material to form the image for reproduction. A water roller rolls over the entire plate wetting the entire non-image surface, the grease-receptive image surface repelling water. The plate then rolls under an inked roller and the image receives the ink which is then transferred to the paper by pressure. This technique is known as direct lithography and requires that the image on the paper plate be a reverse (or mirror) image. In offset lithography, as distinguished from direct lithography, the image on the paper plate is a positive (or right reading) image and is first transferred to an intermediate blanket roller, thence to the paper.
The use of the typewriter for writing on the paper master is just one of the ways an image can be placed on a paper master. For example, paper masters are made on letterpress proof presses in the same manner as a reproduction proof for printing is normally made. A cast of Linotype slugs is inked on the proof press and instead of “pulling” a proof in the usual maimer on ordinary proofing paper, the image, so inked, is pressed into contact with and printed on a paper master. The master is put on an offset lithographic printing press and lithographic printing is produced from it.
The use of the typewriter for writing on a paper master is suitable for various office work. On the other hand, direct image paper masters are often used by printers as a quick. *453 and economical means of handling reruns required by reorders. Direct image paper masters are used in varying sizes, large and small, and on machines other than Davidson’s.
(d) A user of the Davidson machine for lithographic printing may have his own plate-making equipment, including cameras and related photographic equipment for the making of negatives. However, such plates may be purchased from suppliers who specialize in such work.
10. The Model 221 (241) is also capable of doing letterpress printing using rubber plates, electrotypes, loose (also called “foundry”) type, and Linotype slugs.
Letterpress printing is accomplished by removing the water roller unit and the lithographic plate and impression segments and replacing the impression segment with a letterpress printing segment. For the letterpress function the application of the ink is to a raised image over which the ink roller passes. The blanket or intermediate cylinder in offset printing then becomes the impression cylinder which presses the paper against the face of the type image which is then printed on the paper and delivered without being turned over as in offset. It is the adoption of the two-cylinder design instead of the conventional three-cylinder design which makes possible the use of the machine for both lithographic and letterpress printing.
11. The Model 221 (241) can also perform a process of printing described as “letterpress-offset” printing. This is a process that has some of the characteristics of both lithographic offset and letterpress printing. A forward or right reading raised image plate is used and only ink, not moisture, is deposited on the raised surface of the plate. The plate then transfers its inked image onto an intermediate rubber covered blanket cylinder which, in turn, prints the image onto the paper. This method has particular applicability to very long runs. It is inexpensive and simple in operation since there is no ink and water balance to be maintained.
12. The Model 221 (241) can also perform a simultaneous dry offset and embossing process to which Davidson applies the term “Davengraving.” In this process two plates are *454 used. One is attached to the plate segment, bearing a raised image, which places its ink on the blanket, the blanket transferring the inked image to the underside of the paper. The other plate, bearing an identical raised image, is mounted on the impression segment and is so placed (registered) that the pressure of this image is applied to the opposite side of the paper precisely in back of the printed image. At the same time the pressure accomplishes both the transfer of the inked image from the blanket cylinder to the top side of the paper and the embossing of the opposite side of the paper, thus producing a characteristic somewhat resembling engraving. The machine is unique in that it combines these two processes into one.
13. (a) There are various other models of the Davidson two-cylinder, two-purpose machines which were, after the introduction of Model 221, developed and marketed under different model number designations. Some are described below. Although varying somewhat in size, and specifically designed for certain purposes, all are capable of employing the various processes described above.
(b) Around 1948, Davidson developed, manufactured and sold its Model 225, a so-called “tandem” machine. The Model 225 comprises a combination of two Model 221’s (241). While retaining the basic principles of accomplishment and of operation inherent in the 221 in that the printing “heads” are, in essence, the same, the machine nevertheless requires a completely different base to contain the two units. In addition, on a Model 225 the feed roll mechanism on both units is removed and a different feed roll mechanism to operate the tandem is installed. Similarly, the drive mechanism of both units is removed and a completely different one installed, as well as an intermediate conveyor board, unique to the Model 225. A variety of attachments, such as numbering and perforating attachments, and depending upon the intended use of the particular machine, may also be installed.
The combinations of printing possible on the Model 225 are many. There being two printing “heads”, it can print by offset lithography on one side of a sheet on the first unit as well as on the reverse side of the same sheet on the second *455 unit, either of which may be in the same or in different colors. It can print by offset lithography on one unit and imprint or overprint on the second unit by any number of letterpress printing devices. Tickets, checks, etc., may be printed on the first unit by either offset lithography or by letterpress, and sequentially numbered and imprinted on the second unit. One unit only may be operated if desired. Horizontal, vertical or combination numbering can be performed by numbering attachments. Also, in connection with the printing of such items as checks, horizontal and vertical perforations may be accomplished between the checks and their stubs. Davidson machines are capable of meeting the rigid check specifications demanded by the American Bankers Association, including the use of magnetic ink.
Model 225A has one unit offset and one unit relief. Model 225B has both units offset only. Model 225C has one unit offset and one unit offset and relief.
(c) In 1952, Davidson sold its Model 233. This machine is essentially the same as the Model 221 (241) except that it is a larger and more rugged machine which will accept paper up to size 14 by 17% inches.
(d) In 1954, plaintiffs manufactured and sold their Model 237, which is a tandem of two Model 233’s. None of these machines are included in the claims involved in the instant cases.
(e) The Models 221 (241) and 23’3 are plaintiffs’ basic machines of the type involved in the present controversy. Plaintiffs also manufacture machines under additional model numbers, but they are in essence only variations of the basic models. For instance. Model 227. introduced in 1947 Model 224 (1949), Model 251 (1952), Model 242 (1953), and Model 255 (1955), are all such variations of the basic Model 221 (241). Model 224 is adapted to feed two streams of paper at the same time. Model 227 is adapted to take a longer sheet of paper. Model 251 is a so-called “de luxe” version of the Model 221 (241), with a more handsome appearance. Model 242 permits “sit-down” operation.
14. Shortly after the introduction of its first Model 221 in 1940, Davidson found its market restricted by the priorities created by the war emergency. Consequently, its chief *456 potential for sales was the Federal Government and its various departments and agencies. In this connection, the departments and agencies were faced with restrictions upon the purchase of printing presses, since all Government printing was required to be performed by the Government Printing Office. However, they were free to purchase machines which were commonly considered as doing so-called “duplicating” work of a variety frequently performed in businesses and offices for relatively short-run reproduction. For instance, the so-called mimeograph and ditto machines could so be purchased.
Davidson, in an effort to maintain itself in the sole existing market, emphasized the use to which its machine could be put as a “duplicating” machine for office use. Furthermore, the use of the term “Duplicator” in the trade name “Davidson Dual Duplicator” which it had adopted was stressed to convince the departments and agencies that its machine was purchasable as a “duplicating” machine.
As a result, many of the departments and agencies purchased the Davidson Model 221 during the war years for so-called office duplicating purposes.
15. (a) As shown by findings 4, 5, and 8, Davidson’s first two-purpose, two-cylinder machine, i.e., Model 221, was designed and intended as a small printing press to invade the business office field, as well as a machine that would be attractive to regular commercial printing establishments. However, the primary emphasis was on the former field.
After the war, when the commercial market again became available, it continued its sales efforts in the same fields. At this time, Davidson voluntarily collected from its customers and paid to the Government, on all sales of its Model 221, the manufacturers’ excise tax imposed by Section 3406(a)(6) of the Internal Eevenue Code, 26 U.S.C. 3406(a)(6), (1952 Ed.). This subsection headed “Business and Store Machines” imposed such a tax, at the rate of 10 percent, on a number of specified machines, including “duplicating machines.” Davidson collected the tax because so many of its sales of the machine were for use in the field which it felt fell within the office equipment category.
*457 (b) On June 2, 1947, Davidson raised the question of the applicability of the tax to certain of its folding machines. By letter of July 22, 1947, it received a ruling from the Bureau of Internal Eevenue that the tax was not applicable to two models of its folding machines which were of the type used in industrial plants and job printing. The Bureau ruled, however, that another model was a taxable office machine within the meaning of Section 3406(a) (6).
16. Up to its acquisition by Mergenthaler in 1950, Davidson’s primary emphasis continued to be on sales of its Model 221 as a small offset machine in the office equipment field. When Mergenthaler was considering the purchase of Davidson, it weighed the advantages of diversifying into a field which would serve to counteract the Linotype business cycle, to which its business was subject. Previous attempts to diversify in areas not within the graphic arts field, with which Mergenthaler was most familiar and had established contacts, had not been successful. However, it felt that the portion of the graphic arts field with the then greatest growth potential and upward trend was offset printing. Mergenthaler concluded that its purchase of Davidson would thus serve to give Mergenthaler entry into that area and enable it to join in such trend provided Davidson could be exploited in the direction of commercial printing needs. Mergenthaler felt this could be accomplished by the addition of larger machines to the Davidson line, such as first an offset machine that could handle 14- by 20-inch size paper, and ultimately a 17- by 22-inch offset press. It was thought that the latter, machine, which would fall within the $7,000-$8,000 price range, would enter the small press field then occupied almost solely by two machines of other manufacturers, i.e., the Harris-Seybold Company’s Model 122, and the American Type Founders, Inc.’s “Chief.” Mergenthaler felt that Davidson’s failure to exploit the commercial printing field was a manifestation of an artificial restriction by Davidson’s management policy of the full development of both product line and market, as well as a lack of capital.
It was also calculated that with the expansion of Davidson’s line and the increased sales resulting from the intro *458 duction of the larger machines, the production of Davidson machines could be absorbed by Mergenthaler surplus facilities, thus adding further to the Mergenthaler profit potential. It was therefore planned to transfer the manufacture of Davidson’s products to the Mergenthaler plant as soon after the acquisition as was practicable, with Davidson thereafter operating only as a sales organization.
However, it was not Mergenthaler’s intention that Davidson should abandon the office equipment field. Davidson had, prior to 1950, designed a table model as a possible addition to its line. Mergenthaler felt that such a product showed considerable promise as a competitive piece of equipment in its field and would result in increased sales volume for Davidson’s products. It was also felt that further refinements of Davidson’s Model 221, such as the reduction of its noise level and an improved appearance, would similarly serve to strengthen its competitive position in the office equipment field.
Mergenthaler recognized that there was a possibility of adverse reaction by its Linotype customers to Mergenthaler’s entry into the competing offset field. It was therefore planned that, so long as primary emphasis continued to be on sales in the office equipment field, and until Mergenthaler had sufficient time to judge the effect of the Davidson acquisition on Linotype customers, there would be maintained a complete separation of the Davidson sales activities from those of Mergenthaler. It was expected that ultimately, and after the larger offset presses were developed, with their emphasis on the commercial printing trade, the sales efforts and facilities of both companies would be consolidated.
17. (a) As an incident to the general plans which Mer-genthaler had for pushing the sales of Davidson’s products in the commercial printing field, as set forth in finding 16, Davidson commenced, after its acquisition by Mergenthaler in 1950, concentrating its sales efforts upon commercial printing establishments, as well as upon the office equipment field and businesses and organizations which operate their own printing shops to supply their own needs, such as banks, churches, insurance companies, universities, and various State governments. Such a shop is referred to in the *459 trade as a “captive printing plant.” A captive plant may be in all respects similar to and even larger than a commercial printing shop. For instance, it may employ only union pressmen. One of the largest printing establishments in the world is the Government Printing Office, which, since it provides printing only for the Government, is a captive plant. However, a relatively small business or organization having only limited needs for the reproduction of various materials, might still find it feasible to purchase one of the comparatively inexpensive Davidson Model 221’s (approximately $2,000 in 1951), and this could well be its only reproduction machine. Technically, such a small business establishment might be considered as operating a “captive printing plant” even with such a single machine, although normally the business world would not so classify such an operation.
As part of its efforts to increase sales in the commercial printing field, plaintiffs, in 1950, after the purchase of Davidson by Mergenthaler, dropped the term “Duplicator” from their machine designation. Thereafter, all advertisement and sales literature described the machine by the new name of “Davidson Dual” instead of “Davidson Dual Duplicator.” However, the term “Duplicator” to describe Model 221 (241) sometimes persisted after 1950, especially on Davidson’s internal documents. For instance, on one of its price lists issued by its home office to its sales force throughout the country as late as February 11, 1954, it still referred to Models 241 and 251 as “Davidson Duplicators,” although in the same price list it referred to its larger model as the “Davidson Model 233 Press.”
(b) Commencing in 1954, the name of the Davidson machines was again changed to the name “Davidson Dual-Lith,” and the advertising and other sales materials published relating to the machines so described them. This name continues to be used to the present.
18. (a) The advertising and sales material Davidson used prior to 1950, when it referred to its Model 221 as the Davidson Dual Duplicator is referred to in finding 8. As set forth in finding It, in 1950 it commenced referring to its machines, including its Model 233 which was introduced *460 in 1952, as the Davidson Dual and so referred to them until 1954. Set forth below are typical excerpts from Davidson’s advertising and sales literature during such 1950-1954 period.
(b) As to advertising that was applicable or referred to both its smaller Models 221 (241) and 251, and its larger Model 233:
(1) Is Your Printing on a starvation duet ?
* * * It’s a common ailment . . . poor ink coverage ... an inking system that can’t keep up with the demand.
There’s one sure cure ... a Davidson Dual. Here’s why. Because of the exclusive Davidson 2-cylinder principle, the ink rollers always have plenty of free time between impressions in which to get thoroughly re-inked. There’s no danger of skimping. Result . . . exactly the right film of ink evenly distributed over the entire surface of the printing form . . . not just now and then . . . but at each revolution of the cylinder.
That means sharp, lively, easy-to-read type matter . ._. rich, detailed halftones . . . full coverage of solids . . . the kind of printing you like . . . and should have.
If you do ptinting you’ll appreciate this. And, remember . . . the Davidson Dual is the only press that does offset printing, direct lithography, both printing and embossing in one operation, and all forms of letterpress printing . . . always the best method available for each job. No wonder the folks who know say . . . Davidson has the answer. the davidson DUAL The World’s Most Versatile Press.
(2) These super-efficient little presses are doing a whale of a job in hundreds of shops, large and small . . . building job-printing profits . . . turning nuisance jobs into money-makers . . . bringing in new customers . . . delighting the old ones.
DAVIDSON DUAL
both Offset and Letterpress In a Single Unit. model 233. Sheet size: 14" x 17 i¿>".
Also available, Model 251, sheets size, 10" x 14".
(3) If it’s a question of printing, davidson has the answer.
*461 Top quality printing for less than the usual cost of mediocre printing.
Clean, sharp line work . . . excellent halftones . . . fine multi-color work
Full ink coverage and positive stripping of even the most heavily inked forms.
Accurate register equalled only by that of larger, higher priced presses.
Quick starting and simple operation prevents costly delays.
Precision engineering and rugged construction for years of low cost, trouble-free service.
The only press that does offset printing? dry lithography and all forms of letterpress printing.
The only press that will print and emboss in one operation.
(4) And . . . don’t forget . . . the Davidson Dual is the only press that also gives you offset printing, direct lithography and all forms of letterpress printing . . . reproducing from paper or metal offset plates, type, electros, rubber plates and Linotype slugs. * * *
(5) Letterheads — Labels — Envelopes — Bulletins — Office Forms — Advertising Folders — Price Lists — Form Letters — Post Cards — Announcements. Print them all on a Davidson Dual.
(6) The Davidson Dual is the only press that does both offset and letterpress. It’s the only one that gives you small press economy with big press quality. It gives you printing you can be proud of . . . fine halftone and multi-color work * * *.
(7) 100 copies of a Bulletin in 15 minutes. 1,000 copies of a “sales flash” with illustrations — in 1 hour! 25,000 printed pieces — same day! Dreams in some offices ... but every day routine at Christian Science Publishing Society. The Society has set up a unit of two Davidson Duals which serves every department with everything from 4-color process for Advertising to routine forms and statistical data for Accounting. Circulation, however, uses more than half the output, millions of impressions, hundreds of jobs. This huge concern prints 26 different publications including six editions of a daily newspaper. * * * Yet despite the complex demands for promotional material, bulletins, forms, form letters, etc., the two Davidson Duals have a remarkable record for saving time and greatly reducing costs.
*462 (c) As to advertising that referred only to its smaller Model 241:
(1) Only a Davidson gives you both offset and letterpress printing and duplicating. You won’t find a more versatile press anywhere than Model 241. Here’s a unit that will turn out an amazingly wide variety of printed matter... letterheads, envelopes, office forms, advertising folders and booklets, mailing cards, instruction sheets, price lists, form letters, announcements, maps, charts, engineering drawings . . . and hundreds of other items needed by business today * * * Like all Davidson Duals, Model 241 is designed to do both offset and letterpress printing. You can use metal offset plates for full range line and halftone work. You can use Paper Masters for reproducing typed or handwritten copy, line drawings, charts, etc. and printer’s type forms may be proofed directly on these Master’s for immediate offset reproduction. * * * It’s easy to see why the Standard Davidson Dual can turn out fine printing and duplicating at high speed and low cost.
(2) The most versatile press in your shop. Stop for a moment . . . and consider how many of your jobs can be handled better and/or more economically on this one press. By offset. From metal plates reproducing the full range of line and halftone copy. From direct image (paper) plates reproducing typed, hand written or pre-printed material. By Letterpress. From type, hand or Linotype composition. From electrotypes in line or halftone. From economical rubber plates. * * * In other words, the Davidson Dual is a printer’s press with a combination of advantages available on no other single piece of equipment.
(3) “We Need Printing . . . Not Waste Paper. There’s no inventory of out-of-date forms and advertising material in owr stock room. We get only what we need at the moment . . . revise and/or rerun any job anytime. We can afford to because our printing’s done on a Davidson Dual.” In your own office or in the hands of your printer, a Davidson Dual handles much of your printing and cuts costs to a minimum.
(4) Horn to turn a pain in the neck into a profit. Small stuff . . . short runs . . . hurry-up jobs *463 . . . nuisance jobs . . . they’re a pain, in the neck to you and every other printer. They tie up presses and personnel. They cost more to produce than they’re worth. * * * Hundreds of printers, large and small, have found the answer in the Davidson Dual.
(5) A message of importance to all printers. The Government New Arms Program is expanding rapidly, resulting in a tremendous demand for local forms, bulletins, specification sheets and hundreds of other items. * * * The ideal equipment for the fast, economical production of a great part of this printing is either the Standard or the Multiple Davidson Dual. These presses will print either offset or letterpress * * *.
(6) Why are private printing departments started? No business sets up its own printing department just for fun. Yet there are thousands of them . . . turning out millions of dollars worth of printing each year. And here’s why: Many of them were started simply because it was the only way ... to get fast, dependable delivery of important printed matter. * * * many printers are not “deadline conscious.” * * * yet a delay of a day ... or even a few hours ... in the delivery of an announcement or a price change notice may cost thousands of dollars. At the same time, it may result in the loss of a good customer. * * * The Davidson Dual is designed specifically for this kind of work. * * * There’s a place in your plant for a Davidson.
(7) A free service made possible by low cost imprinting on a Davidson Dual. * * * First National Bank of Portland says these personalized checks are responsible for important savings in time and money. * * * Customers’ names and addresses are typed on low cost Davidson Paper Masters with an electric typewriter. * * * you can offer the same service to your patrons.
(d) As to advertising that referred only to its Model 251, the so-called deluxe version of the 241:
(1) The New Davidson Dual Model 251 — Printing and Duplicating — Offset and Letterpress — All with this one unit.
Outstanding Advantages — 1. Both offset and letterpress printing and duplicating. 2. Prints *464 from paper or metal offset plates, type, electrotypes, Linotype slugs and rubber plates. * * *
New Features — * * * 3. Quieter operation. * * * 10. New streamlined design finished in handsome Davidson grey.
It's a handsome ‘piece of. equipment, this sleek, streamlined business machine with its rich grey finish. * * * You’ll find this new model considerably more quiet running.
Both Printing and Duplicating — The Davidson Dual is the ideal press for turning out long or short runs of such things as letterheads, envelopes, advertising literature, labels, office forms,* * * and a host of other small printed matter.* * * Then, in addition, the Davidson Dual does the very finest duplicating . . . form letters, sales bulletins, bills of material, engineering drawings, reports, publicity releases, maps, charts etc. Anything that can be typed, written, ruled or drawn can be reproduced quickly ... a few copies or thousands . . . using low cost paper masters. * * * every copy from first to last is an exact duplicate of the original.
Ash for a Demonstration — The best way to determine whether or not there’s a place in your business for a Davidson Dual is to see it in operation. * * *
Only Davidson Dual provides both offset and letterpress printing and duplicating in a single unit.
(2) It’s the press that fills a big need in any shop . . . Designed specifically for long or short runs of letterheads, envelopes, office forms, bulletins, blotters ... No wonder the Davidson Dual is the leading profit maker in hundreds of shops all over the country.
(e) As to advertising that referred only to its larger Model 233:
(1) The One Press You Can’t Afford To Be Without — davidson dual model 233 — Here’s your ideal general utility press * * *.
Model 233 embodies all the important basic features of the original 10" x 14" Davidson Dual. However, it is considerably larger in size, being built to handle sheets up to 14" x 17%". The printing area is a full 13" x 17".
*465 * * * With this one unit you can turn out both offset and letterpress printing. And you can make the change-over from one method to the other in approximately ten minutes. * * *
Like all Davidson Duals, Model 233 is designed for simple adjustment, quick make-ready and easy operation. * * *
There’s a place in your shop for this press.
(2) This unit was developed specifically lor commercial printers in response to a growing demand for a press that would provide all the efficiencies of the standard Davidson Dual but with a larger printing area.
Model 233 has a full printing area of 13" x 17" and handles a wide variety of stock from manifold to light cardboard in sizes from 4" x 6" to 14" x 171/2". It operates at speeds up to 5400 per hour and occupies only 65" x 35" of floor space.
‡ *
The Davidson Dual Model 233 is ideal for 8%" x 11" work-and-tum forms, 11" x 17" four-page folders, letterheads two-up, and hundreds of other jobs. Its unusual versatility, high speed and low operating cost combine to make Model 233 a worthwhile investment for any printer, large or small.
(3) Why more printers are buying the new wider DAVIDSON DUAL.
It makes prompt service easy . . . keeps customers happy . . . attracts new ones. It’s the ideal general utility press * * *.
Mr. Business Man: For prompt service and top quality, buy from a printer who has a Davidson.
(f) As to its sales literature pertaining to its Model 225-A, its tandem of the 221:
MODEL-22 5A MULTIPLE DAVIDSON DUAL ONE UNIT
OUTSET-ONE UNIT RELIEF
With the Multiple Davidson Dual, it is possible to produce both offset and relief printing in one operation, thus providing great flexibility and still greater savings on all kinds of jobs.
With one operator and in one operation you can, where copy is otherwise suitable—
*466 Print both, sides of paper (one side offset, the other relief and in two colors, if desired).
Print advertising literature and imprint dealer names.
Print business forms and number (in color, if desired).
Print letterhead and letter one color, signature another.
Any of these printing combinations may be produced at the same high operating speeds as on a standard Davidson Dual and you have the choice of six printing mediums—
Metal Offset Plates — Paper Masters — Rubber Plates— Standard Linotype Slugs — Curved Electrotypes or Loose Type.
(g) Plaintiffs’ advertising of the above nature appeared in such publications as “Graphic Arts Monthly,” “The Office,” “Nation’s Business,” “American Business,” “Time Magazine,” “Burroughs Clearing House,” “Editor and Publisher,” “Inland Printer,” “American Printer,” and “Business Week.”
19. (a) As shown in finding 17, commencing in 1954, plaintiffs again changed the designation of their machines from the “Davidson Dual” to the “Davidson Dual-Lith.” Set forth below are typical excerpts from plaintiffs’ sales literature after 1954.
(b) As to advertising applicable to both its small Model 241 series, and its larger Model 233:
(1) davidsoN dual-lith is engineered and built in the plant of the mergenthaler linotype company one of the largest and finest of its kind in the world.
SYMBOLS OP PERFECTION IN THE GRAPHIC ARTS.
(2) * * * davidson corporation, a subsidiary of the MERGENTHALER LINOTYPE COMPANY, A HALLMARK OP THE GRAPHIC ARTS.
( 3) 70 years op engineering experience and a tradition of fine craftsmanship—
That’s what stands behind every davidson dual-lith. Precision manufacturing produces a precision machine, with specifications and close tolerances unequalled for small offset equipment. Davidson dual-lith stands alone, a pocket edition of the biggest, most expensive printing equipment in the graphic arts industry.
*467 (4) HOW TO DO 8 PRINTING PROCESSES ON 1 MACHINE! 1. Prints 2 sides at once. 2. Davengraving. 3. Offset Lithography. 4. Dry Offset. 5. Letterpress. 6. Imprinting from Linotype slugs. 7. Numbering. 8. Perforating.
(5) Questions <& Answers About the Davidson Dual-Lvth
Q. Can everybody use the Davidson Dual-Lith?
A. The precision engineering and sturdy construction of the Davidson Dual-Lith have made it appeal to printers, of course, but these same features, together with its simplicity and ease of operation, make it the preferred small offset equipment for business, for office applications, for Government and for schools as well. The Davidson Dual-Lith is the ideal general purpose small offset machine for both short and long runs.

Q. Is the Davidson Dual-Lith limited in the types and sizes of plates which can be handled?

A. All types, sizes and thicknesses of plates can be handled with ease * * * direct image paper masters, presensitized metal plates, heavy zinc plates, small plates or full size plates * * * lets you use a quick change segment for short run paper master work, and switch to a vise-like clamp that holds the plate positively for long runs.

Q. Is the Davidson Dual-Lith easy to operate?

A. Yes indeed. * * * is designed and engineered for simple, easy, flick of the wrist operation. * * * An inexperienced operator gains confidence quickly because it is hard to make a mistake when operating a Davidson Dual-Lith.
Q. Gan one of my present employees operate it?
A. Any person of ordinary aptitude can be trained to operate the Davidson Dual-Lith successfully in a short time. Your Davidson Distributor provides this instruction service for all * * * purchasers without additional charge.
Q. Is the * * * cylinder easy to twm by hand?
A. It certainly is. The easy-turn hand wheel swings the cylinder aromid with very little effort. Simply ask any one of the many girls who operate Davidson Dual-Liths all over the country.
*468 Q. Is there a model especially suited for quick, easy short-nm work?
A. Yes. * * * Model 242 is the ideal short-run offset machine. * * * All major operating controls * * * are located where they can be reached instantly, from a sitting position.
Q. Is the Davidson Dudl-Lith made in more them one size?
A. Yes, the Davidson Dual-Lith is made in two sheet sizes:
1. To handle sheets from 8" x 5" to 10" x 14".
2. To handle sheets from 4" x 6" to 14" x 17%".
Q. Who uses the Da/oidson Dudl-Lith? Where have they been sold?
A. Here are just a few of the many satisfied * * * owners who can be found throughout the world. (Then follows a list of 160 organizations, consisting of large business corporations, including retailers, such as “A & P Food Stores”; manufacturers, such as “Goodyear Tire & Rubber Co.”; trade associations, such as the “National Association of Manufacturers”; charities, such as the “American National Red Cross” and “Goodwill Industries”; governmental entities, such els the “U.S. Department of Army” and the “Indiana State Police”; fraternal orders, such as “Lions International”; educational institutions, such as “Rutgers University” and “University of Minnesota”; and insurance companies, railroads, airlines, and newspapers.)
(c) As to advertising that pertained only to its Model 241:
(1) see how davidson dual-lith does more for you! PRINTS both sides at once * * * Two-sided forms and other jobs requiring printing on both sides are handled in half the time * * *.
COMPLETE LINE OF ATTACHMENTS.
Precision-built, interchangeable attachments give you the opportunity to adapt Model 241 to meet your individual printing needs. Davidson Pre-sensitized Plates * * * further assure the finest quality reproduction, whether it’s a short run or a long run job * * *.
(2) Model 241 Davidson Dual-Lith meets your printing needs as they occur. Why be limited to offset lithography % You can meet your printing require *469 ments for a wide range of specific jobs when yon install Davidson Dual-Lith Model 241. Built-in versatility means that you can select the method best suited to the job at hand * * *. And you need only one Model 241 to meet practically any reproduction contingency which may arise. With one Model 241, you solve scores of printing problems.
(d) As to advertising that pertained only to its Model 242:
(1) now 25% to 30% more short-run production of 1 and 2-sided Forms, Bulletins, Promotional Pieces! working hand in hand to bring you the fastest and finest in short-run office reproduction, the davidson dual-lith Model 242 plus Davidson Paper Masters and Presensitized Paper Plates are an unbeatable team.
Whether you type, write or draw directly on Davidson Paper Masters or use one of Davidson’s Pre-sensitized Plates for reproduction of sparkling line, solids and halftones, actual reproduction should take less time — from the moment a request comes in to the instant the completed copies are placed in your hands — tham it takes you to read this folder!
* * * * *
12,000 IMPRESSIONS PER HOUR WHEN YOU PRINT BOTH SIDES AT ONCE.
It’s so easy to handle those forms and other jobs requiring printing on both sides when you use davidson dual-lith Model 242. The quick, simple addition of a second standard offset plate segment lets you print one side by offset lithography and the other by direct lithography — simultaneously— on one trip of the sheet through the printing unit. No waiting, no delay! And you get 12,000 impressions per hour!
davidson dual-lith is easy to operate, easy turning. A skilled or unskilled operator can give you ultimate quality reproduction. The precision, automatic features of Model 242 make it the easiest and fastest machine for short run reproduction, but it’s the best in the long run, too. [Female secretary type office employee pictured seated and operating the machine.]
(2) Finger-Tiy Controls — making it faster and easier for any operator, skilled or unskilled . . . Plus *470 Automatic Operation for tbe greatest short run offset performance obtainable.
Davidson Dual-Lith Introduces New Ease, New Speed into Short Run Offset Reproduction — And it prints two sides for the price of one! * * *
Your stenographers sit down while they type ... . why shouldn’t a girl operate your offset machine from a sitting position if she chooses to.
NOW, with the Davidson Dual-Lith Model 242, your short run offset reproductions can be run off . . . quickly . . . easily . . . almost effortlessly .. . . by a relaxed operator, seated at the machine. [Female secretary type office employee pictured seated and operating the machine.]
(e) As to advertising that pertained only to its larger Model 233:
Cut Printing Time and Costs with the Big New Davidson Dual-Lith Model 233. Now you can have top quality, high speed Davidson Dual-Lith performance with a big machine — big in the size sheets it handles (up to 14" x 17%"), big in the wide range of its applications, big in terms of the work it will produce for you, and most important of all — big in the savings it brings to you in printing time and costs! Model 233 gives you 8 processes on 1 piece of equipment * * *.
Heavy Duty Construction. Sturdy cast and machined parts predominate * * *.
Model 233 meets every one of your reproduction requirements as they occur. * * *
Because of its 2-cylinder design and removable segments, Davidson Dual-Lith exclusively in the small offset equipment field, offers you built-in versatility — 8 printing processes all on 1 machine.
20. About 1942, Davidson commenced development work on a small machine limited to offset work only and which it intended to market primarily in the office equipment field. Around 1947, Davidson marketed these machines as their Models 209 and 210. However, the introduction of these machines met with failure. After selling 80 of them, it took back 79, and withdrew the machine from the market prior to 1950.
However, Davidson continued to do research and development work on a machine employing only the offset litho *471 graphic principle and designed especially for office use. After Mergenthaler purchased Davidson in 1950, this research was given impetus by Mergenthaler’s research facilities and finances.
A systematic survey was made of business firms to determine their operational needs for such a machine. It was determined that these needs included: (1) office appearance, (2) office noise level, (3) operator comfort, i.e., whether the operator should sit or stand, (4) observation of the whole machine from operational position, (5) accessibility of and ease of operation of controls, (6) adequate productive capacity so as to satisfy normal office requirements, (7) automatic feeder, and (8) alternate hand feeder. After years of effort and the development of an automatic paper plate changer, plaintiffs placed such a machine on the market in 1958 under the name of Dav-A-Matic, and which they describe in their advertising literature as an “all purpose offset duplicator, designed for (1) general duplicating, (2) short run duplicating, (3) systems duplicating.” This machine operates by the offset printing principle with special direct image paper masters that are less brittle than those used on the Davidson Dual-Lith machines. However, these paper masters too are intended for use with a typewriter.
While the Dav-A-Matic is not as easy to operate as a stencil or hectograph machine, it does utilize a simple offset process. Plaintiffs advertise that the machine incorporates “Simplified controls that any office worker could operate,” and that it permits, “Sit down operation to eliminate fatigue.” It does not do letterpress work. Of the several printing processes attributable to the Davidson Dual-Lith machines, as hereinabove described, the Dav-A-Matic employs only one, i.e., offset lithography from direct image paper masters. Plaintiffs do not in this proceeding dispute the applicability of the Federal excise tax to this machine.
21. The 1959 New York Classified Telephone Directory carried Davidson’s advertisement under the heading Davidson Duplicating Products. Below such heading appeared the following: “Dav-A-Matic office offset duplicators for general, short-run and systems work. Dual-Liths for qual *472 ity offset, 2-sided lithography, letterpress, numbering and perforating on one machine. Davidson Duorite plates, paper masters and supplies.”
22. Mergenthaler’s annual reports to its stockholders for 1953, 1954 and 1955 referred to Davidson’s products as “rotary presses” and to supplies sold by it as those used for “offset printing.”
The 1954 report referred to the exhibition “of the Davidson line at graphic arts and industrial fairs” held in Europe, and to the introduction on the market in recent months of “a short run press * * * and Photorite (a presensitized paper plate).” It further stated that “During the past four years Davidson Corporation has undergone a necessary major reorganization. Much effort has been devoted to the development of an aggressive sales organization, the improvement and extension of its product line and the integration of Davidson into the Linotype organization.”
The 1955 report stated:
National distribution rights were obtained by Davidson for a direct image plate designed for use with the Yerifax process recently developed by Eastman Kodak for quick reproduction in limited quantities of letters, drawings, and printed matter. This plate was marketed under the name V-Kote and initial customer reaction has been good.
^ ‡ ‡ ‡
Research in other fields of the graphic arts has not been neglected. Certain improvements and new attachments in our existing Linotype and Davidson lines appeared in the past year. Other developments in these and related branches of the graphic arts are well under way and will be introduced year by year hereafter as they reach product form.
The report also illustrated the demonstration of Davidson Dual-Liths at the Tenth Annual International Printing Machinery and Allied Trades Exhibition in London, England, with the following caption:
These versatile Davidson Dual-Liths were in operation during the entire show. The interest displayed in this one machine that offers six printing methods indicates the overseas markets developing for Davidson products.
*473 23. On April 6, 1959, Mergenthaler issued a prospectus concerning an additional issue of stock. Said prospectus included the following statement:
OTHER PRINTING EQUIPMENT
The Corporation also manufactures the Davidson line of small rotary printing presses and related equipment, which it sells through Davidson Corporation, a wholly-owned subsidiary, to commercial printers and to the office equipment market. The small press and office equipment industries are highly competitive but the Corporation believes that sales of these products will be an increasingly important factor in the Corporation’s business in the future.
The prospectus stated that Mergenthaler owned 40 percent of the stock of the Radiation Electronics Corporation, that in 1957 it began to invest in the stock of The Electric Auto-Lite Company, which is “principally engaged in the manufacture and sale of automotive electrical equipment and a wide variety of other automotive parts,” and that “It is the Corporation’s belief that Auto-Lite investment offers a vehicle for diversification outside the graphic arts equipment field.” It was also noted, however, that a group of stockholders, including Mergenthaler’s former president, who was such officer in 1950 when Mergenthaler acquired Davidson, and who had strongly recommended such acquisition, had instituted an action claiming that Mergenthaler’s purchases of Auto-Lite and Radiation Electronics stock “were ultra vires and not for a proper corporate purpose. * * * The complaint * * * seeks * * * a direction that the said stock be disposed of and an injunction against the purchase of stock of any company whose business is not related to that of the Corporation.”
24. (a) Plaintiffs maintain records designed to indicate various classifications into which the purchasers of its Dual-Lith machines fall. These records are denominated “User Cards.” The classifications are made pursuant to a “Market Classification Code”, containing 16 categories of “users.”
The following is an analysis of the sales of Models 221, 241, 251, and 233 for the 15-year period 1945-1960, limited to the New York City area, as shown by these Market Classification Code and User Card records:

*474

*475 It is not shown how many of the classifications of users other than the “Printer, Commercial” use these machines in a manner limited to that generally associated with office type duplication, or whether they operate the machines on a broader basis and as part of a separate printing department or so-called “captive printing plant” which does work similar to that done by commercial printers. By far the greatest use of the machines is for offset reproduction work. When used by such businesses and organizations, many felt that the noise level of the original Model 221 made its location in a separate room advisable. In addition, with its quite fully exposed machine parts and its general appearance as a rotary printing press, even though a small one, many did not feel that it had the general physical appearance suitable to that part of an organization’s layout in which general office workers and executives operate, or in which the general public enters to transact its business. However, as shown by finding 16, at the time Mergenthaler purchased Davidson in 1950, it recognized these defects in the Model 221, and planned to take steps to reduce the machine’s noise level and improve its general appearance. After the merger, the Model 251, referred to as the de luxe version of the 241, was produced to attempt to meet these objections. As shown by finding 18(d), it is advertised as having “quieter operation” and a “new streamlined design finished in handsome Davidson grey.” This model more fully encloses the machine parts from the side view and makes its general appearance more attractive, although it still has a noise level which may cause an organization to locate it in a separate room. However, as shown by finding 22, many business firms do not consider either the noise level or the appearance of the standard type, non-de luxe machines as objectionable and incorporate them into their regular office set-ups. Of course, if the organization runs a “captive printing plant” department with several machines, it would in the normal course segregate such department from its administrative offices anyway. Since the de luxe Model 251 is essentially the same machine as the standard Model 241, the 241 would also be quieter in operation than the original Model 221 which it replaced. As shown by the claims for refund which plaintiffs filed, as here *476 inafter set forth, the standard Model 241 outsells the de luxe Model 251.
(b) At the present time, about two-thirds of the plaintiffs’ sales of their Dual-Lith machines are comprised of the Model 241 and its derivatives. The remaining one-third consists of sales of the Model 233 and its derivatives.
(c) About 85 percent of the sales of Dual-Lith machines are made for the purpose of, and are equipped for, only offset work. Of the remaining 15 percent, approximately half are sold and equipped to do only letterpress, while the remaining half are sold and equipped to do both offset and letterpress. However, these are only original sales and it is not known how many separate attachments are later purchased to enable the offset machines to do letterpress or the letterpress machines to do offset. The basic machine comes without attachments and the purchaser may subsequently obtain the attachments to perform the various operations as herein-above described.
i25. As noted in finding 15, Section 3406(a) (6) of the Internal Revenue Code of 1939, 26 TJ.S.C. 3406(a)(6) (1952 Ed.), headed “Business and Store Machines,” imposed a 10 percent manufacturers’ excise tax on “duplicating machines.” It also imposed such a tax on “multigraph machines.” Section 4191 under “Part I — Business Machines” of subchapter E of the Internal Revenue Code of 1954, 26 U.S.C. 3406(a) (6) (1958 Ed.), imposes a similar tax on “duplicating machines.” It also imposes such a tax on “multigraph machines.”
The substantive issue herein is whether Model 221 (241) and its derivatives, as hereinabove described (including Model 225), and Model 233 were, during the periods covered by the claims set forth in the petitions herein, “business”, “store”, or “duplicating” machines within the meaning of these sections. Defendant claims they fall into such categories and that they are, therefore, subject to the tax imposed by such sections. These sections do not by name impose any such tax upon “printing presses.” As shown by finding 15, defendant ruled in 1947 that such provisions would not apply to machines which it considers as falling within the type used in industrial plants and job printing. Defendant has not *477 sought to apply the tax to the type of printing machine or press which, considering the quality of work performed, its construction, size, weight, required skill of operation, price, and the market sought, is normally associated with commercial print shop operations. Plaintiffs contend that the machines in question are not “business”, “store”, or “duplicating” machines within the meaning of the statutes, that instead they were and are properly to be considered as “printing presses”, that their machines meet the criteria normally associated with commercial printing shop machines, that they are widely used in such shops, and that they are, therefore, not subject to the tax. These contentions have lead, among other things, to a consideration of the distinction between “printing” and “duplicating”, as well as the types of machines which perform these operations.
Actually, in the day-to-day business of the commercial world, there is ordinarily no need to make a sharp distinction between “printing” and “duplicating.” The terms are sometimes used interchangeably. For instance, as shown in finding 7, plaintiffs’ publication entitled “Offset [Reproduction and the Davidson Dual”, which is currently in use, states that when paper masters are used on short runs on their machines, “their use is sometimes called ‘duplicating’,” and the “press when used as such is often called a ‘duplicator’.” Any multiple reproduction process, including printing, is in a sense a duplicating process.
Nevertheless, in the trade certain types of processes are commonly referred to as “duplicating”, and the machines performing such processes have come to be known as “duplicators.” These are'machines which are generally considered as a type of business or office machine, used principally for internal short run work. Therefore, manufacturers of machines appealing to the office market are likely to call their machines, or to advertise them as, “duplicators.” As shown, this is the course that Davidson originally followed when it invaded the business office field with its Model 221.
Originally, the machines which were most commonly considered as falling in the “duplicating” category were the machines employing the stencil and spirit processes, *478 such as tbe mimeograph and ditto machines. The A. B. Dick Company and the Addressograph-Multigraph Corporation are two well-known manufacturers of such machines which have specialized in catering to the office equipment market. The products of the stencil and spirit duplicating processes are, by the quality of work performed, and the types of ink and paper used, readily distinguishable from the products of the printing process, whether letterpress or offset. However, the manufacturers of the so-called stencil and spirit process “duplicators” have in recent years developed machines, also called “duplicators”, to perform offset reproduction with a variety of plates, including paper plates on which the image may be prepared by regular typewriters, the product of which is indistinguishable from the product of “printing presses” also performing offset reproduction by the same methods. These machines are offered as “offset duplicators”, and the process as “offset duplicating.” Since the process is identical with that which may be and is frequently performed by the traditional type of printing press capable of performing offset lithography, this has further tended to blur the distinctions between “printing” and “duplicating.”
More recently, as shown by the above-mentioned booklet published by plaintiffs, short runs of the type that would be required by a business or administrative office are commonly referred to as “duplicating”, regardless of the type of machine performing the operation, and the machine performing such work, regardless of its inherent characteristics, as a “duplicator”, while long run work is commonly referred to as “printing”, and the machines performing such work, as “printing presses”, although the machine is the same as the one performing the short run work. Said booklet describes, for instance, the “Davidson #2 Medium Bun Paper Masters”, for use on its Models 283, 241 and 251, as follows:
Designed for medium length runs, these plates are excellent for systems work, medium and short run duplicating, pre-printed forms, and other jobs for which a medium number of quality copies are needed.
In this connection, Davidson also has a “long run” paper master which it describes as being applicable to “long run *479 duplicating systems.” Its “Davidson #3 Long Eun Paper Masters”, for use on said Models 233, 241 and 251, are described in said booklet as follows:
Long Eun Plates are prepared from a heavier base stock than Medium Eun Plates, have heavier coatings and are more sturdily constructed. They are ideal for long run duplicating systems, pre-printed forms and for long run material prepared on an electric typewriter.
Since so much long run work by commercial printing shops is accomplished by offset lithography with reverse image photomechanical negatives or plates, such process is normally not considered by the trade as “duplicating.” This process has replaced much work that was at one time done by letterpress. However, since the wide use for relatively short run work of the more modem technique of paper plates, on which the image may be produced directly with a typewriter or by other direct applications, the trade does frequently consider the use of the offset principle with direct image paper masters as falling within the “duplicating” category, so that now such offset principle involving the use of such masters is frequently classified as “duplicating”, and the phrase “offset duplicating” is currently widely employed.
26. Because of the Government’s requirements that all “printing” for the Government’s purposes be performed by the Government Printing Office, as was referred to in finding 14, it has, for this purpose, become necessary to attempt a technical definition and distinction between “printing” and “duplicating.”
The Congress has established a Joint Committee on Printing. By statute, this committee has the following authority:
sec. 111. All printing, binding, and blank-book work for Congress, the Executive Office, the Judiciary (other than the Supreme Court of the United States), and every _ executive department, independent office, and establishment of the Government, shall be done at the Government Printing Office, except (1) such classes of work as shall be deemed by the Joint Committee on Printing to be urgent or necessary to have done elsewhere; and (2) printing in field printing plants operated by any such executive department, independent office, or establishment, and the procurement of printing by any such executive department, independent office, *480 or establishment from allotments for contract field printing, if approved by the Joint Committee on Printing. (July 5,1949, 63 Stat. 405.)
Under the authority of the statute, the Committee has promulgated, from time to time, regulations known as “Printing and Binding Regulations” in which both “printing” and “duplicating” have been defined for the purpose of specifying the type of work that individual Government agencies can do themselves and the type of work that must be done in either the Government Printing Office or in authorized field printing plants, as well as for the purpose of delineating particular kinds of equipment that may be purchased only with the specific approval of the Joint Committee on Printing and other kinds of equipment that may be purchased without Joint Committee approval. The regulations for 1951 and 1952 provided:
6. Printing. The term “printing” as used in these regulations shall be construed to include:
(a) Preparation of final copy by any method used as a substitute for typesetting or for reproduction by photo-mechanical means, exclusive of material to be produced on office-type duplicating machines as defined in exceptions below.
(b) All common processes of reproduction such as relief [letterpress], intaglio [gravure], or planographic [lithographic], including office-type duplicating machines operated in connection with authorized printing plants. * * *
EXCEPTIONS
The term “printing” will not include office-type duplicating machines which are not operated in connection with authorized printing plants and will:
(a) Only utilize stencils, masters, direct-image, or paper plates prepared by typewriter or other office device. Provided: That the image on such stencils, masters, direct-image or paper plates is neither reduced nor enlarged from the original copy.
(b) Produce no more copies of any individual item than can be obtained from any one stencil, master, direct-image, or paper plate, or any one set of same at one or more than one successive machine run. Provided: *481 That items consisting of one or more than one page shall not exceed 25,000 production units in the aggregate.
The 1959 regulations provided as follows:
1. printing. — The term “printing” as used in these regulations shall be construed to include and apply to the processes of composition, platemaking, presswork, and binding; the equipment as classified in paragraph 12 and used in such processes; and the end items produced by such processes and equipment. (Composition shall include typesetting or final copy prepared by any method used as a substitute for typesetting when such material is procured commercially or produced in authorized printing plants and is to be used in the production of printing or a printing plate.)
2. duplicating. — The term “duplicating” as used in these regulations shall be construed to include material produced by use of (a) equipment listed in column 2 of paragraph 12, and (b) stencils, masters, and direct-image plates which are to be used on duplicating equipment not larger than 10 by 15 inches and winch are prepared by methods or devices that do not utilize photomechanical negatives and/or exposure frames. Provided, That not to exceed 5,000 production units shall be produced of any page and that items consisting of multiple pages will not exceed 25,000 production units in the aggregate. Note: Installations which have offset duplicators but do not have printing plant authorization are not authorized to print from plates made from photomechanical negatives and/or exposure frames.
3. printing plant. — The term “printing plant,” as used in these regulations, shall be construed to mean any plant which produces “printing” as defined in paragraph 1, owned or operated wholly or in part by the Government or at Government expense, and shall include all such plants located on property owned or controlled by the Government, and using any of the following methods of reproduction or types of equipment:
(a) Offset presses of any size, which print from sheets or rolls and which employ—
(1) Photomechanically made offset plates.
(2) Sensitized paper masters and/or exposure frames used in connection with photomechanical negatives.
(b) Machines which utilize special-cast type such as Multigraph.
*482 (c) Letterpresses of any size which utilize printer’s type, plates, or engravings, except hand-operated or foot-operated letterpresses used solely for the production of map and chart titles.
(d) Typecasting or typesetting machines of any kind (Linotype, Intertype, Monotype, Fotosetter, etc.).
(e) Manufacture of rubber stamps or rubber plates.
(f) Power-operated cutting, binding, and stamping equipment required to complete the manufacture of material produced by any of the aforementioned types of machines.
(g) Duplicating machines (offset, spirit or gelatin process, stencil process), photostatj diazo, B/W, blueprint, photodeveloping, photoprinting, photoenlarging, etc., when operated in connection with the above machines.
Under a listing of the equipment referred to in paragraph 2(a) above appears the following:
DUPLICATING MACHINES :
Offset lithographic presses, sheet-fed; provided that only nonphotomechanically made masters are used and provided that the maximum sheet size capability of the nress is not larger than 10 x 15 inches. (Davidson, A. B. Dick, Addressograph-Multigraph, Dittolith, Whitin)
Spirit or gelatin processes (A. B. Dick, Rex-O-Graph, Old Town, Copy Rite, Ditto, Standard, Duplicopy, Banda, Hectographia).
Stencil processes (Gestetner, A. B. Dick, Marr, Rex Rotary, Speed-O-Print, Copy Rex, Rudco).
As to these machines, no Joint Committee approval is specified as being necessary when purchased by an agency or department, provided their use is as set forth. However, Committee approval is specified as being necessary when the equipment is to be operated in connection with an authorized printing plant, as defined in paragraph 3 above.
The equipment list further provides as follows:
peesses, printing:
Combination offset lithographic and letterpresses (Davidson).
Offset lithographic, all sizes using photomechanically produced plates, sheet-fed, web-fed, and perfecting *483 (Davidson, A. B. Dick, Addressograph-Multigraph, Dittolith, Consolidated, Miller, Royal Zenith, Babcock, Harris, Miehle, EBCO, ATF, Hoe, Lithoid, Handscho, Hess & Barker, Whitin).
As to these machines, the approval of the Joint Committee on Printing is specified as being necessary prior to purchase in all instances.
27. (a) After Davidson ceased naming and advertising its Model 221 as a “Duplicator” and commenced placing increased emphasis upon sales to commercial print shops, certain media in the printing or graphic arts industry classified Davidson’s two-purpose two-cylinder machines as printing presses. For instance, the “Printing Magazine Yearbook” for 1955, under the heading “Printing Press Specifications,” included these machines in a list of “Offset Presses — Single Color — (Sheet-Feed),” which set forth the maximum and minimum sheet sizes of the various machines listed. The introductory statement was:
Presented on this and the facing page is a tabulation of the maximum and minimum sheet sizes of letterpress, offset and gravure printing presses in general use in the commercial printing field * * *.
Three other major companies manufacture certain small offset machines which can perform the same kind of lithographic printing in the same or similar sheet sizes as the Davidson machines. Therefore, these machines of such three companies may, in certain aspects, be considered to be in competition with the Davidson machines. The competitive machines so listed in said yearbook were the “ATF Little Chief 20,” manufactured by American Type Founders, Inc., the “Harris 120,” manufactured by Harris-Seybold Company, and the “Miehle #17,” manufactured by the Miehle Printing Press and Manufacturing Company.
The same trade publication’s 1959 “Purchasing Manual” gave a similar listing. However, this list included another machine, the ATF Chief 15, which, on the basis of sheet size and other characteristics, makes this machine also competitive. In addition, the Miehle Company now produces a *484 Model 20 which, on the same bases, is also a competitive machine.
In a publication entitled, “Know-How as to Modem Printing,” published around 1958 by the International Typographical Union for its members, a Davidson machine is illustrated with the following comment:
the davidsoN offset press (above) is one of the smallest and most compact presses with a sheet size capacity of 10x14 inches. It prints from regular offset plates, but with adjustments and a special plate, will print on both sides of the sheet simultaneously.
The publication also listed the various “Training Courses” that the Union makes available to its members. Included is a 3-week course in “Offset Presses.” The course description is as follows:
Instruction in use of cylinders, locking plate, mixing inks; setting rollers; head and side guides; rolling of plate; registering job; running press; color application; gumming plate and proper washup on Harris-Seybold, ATF Chief and Davidson offset presses.
(b) During the period when Davidson offered its Model 221 as a “Duplicator,” and for a period of time thereafter, no Davidson advertising appeared in various printing trades media, although such media did carry advertising by such companies as American Type Founders, Inc. Similarly, during such period lists of “Printing Presses Manufactured” and “Printing Press Specifications” published in such media, similar to the lists referred to in subparagraph (a), did not include any Davidson machine, although the ATF products were listed. In one such trade publication, the American Printer’s Buying Guide and Directory for 1952, the Davidson Model 221 was listed instead as an “Offset-Relief Duplicator.” In another such publication, the September 1951 issue of “Modem Lithography,” an “Offset Press Specification Chart” did not list any Davidson machine, although it did list ATF, Harris and Miehle machines.
Similarly, during such period Davidson advertised in such office equipment trade media as “The Office Management and Equipment Purchasing Guide.” This Guide listed the *485 Davidson machines under a list headed, “Machines, Duplicating, Offset.” None of the ATF or other machines referred to in subparagraph (a) above were so listed. Also, the trade publication “Office Appliance Buyer’s Guide” for 1952 carried Davidson advertising, although none appeared for ATF. This publication carried the Davidson machines under the heading “Duplicators,” together with certain machines of A. B. Dick Company and the Addressograph-Multi-graph machines, which machines of said companies have been considered by the trade as falling within the office duplicating type category, as hereinabove noted in finding 25. There were no ATF products so listed in this publication.
28. (a) The following chart shows the maximum and minimum sheet sizes of the machines mentioned in finding 27, their weights, prices, and the speeds at which they can operate, measured by the number of impressions per hour that can be produced. The prices of the Davidson machines are set forth for the performance of offset printing only, and without letterpress or other attachments. The Davidson tandem models are not included since the record does not indicate comparable data for any similar machines of the other manufacturers.
(b) The Davidson “tandem” machines, described in finding 18(b) and 13(d), consist basically of two machines of Models 221 (241) or the larger Model 233. The former is Model 225 and the latter Model 237. No tandem machines of the latter variety are involved in these proceedings, e.g., no taxes paid on the sales of any such machines are included in, any of the claims involved herein. Only 23 sales of Model 225 tandems are included in such claims. These claims covering such sales show that, in 1950, the prices of these machines, exclusive of the 10 percent excise tax, were approximately $2,500. During the later periods covered by such claims, and extending into 1957, the sales prices were approximately $4,500, exclusive of the tax. The prices of these tandem machines could go considerably higher, depending upon the number and nature of attachments included.

*486

*487 The “User” study referred to in finding 24(a) did not include an analysis of the Model 225. The claims for refund covering the sales of the 23 Model 225’s herein involved show that the purchasers of said machines were as follows:
Refund Claim Filed May 1¡., 195b: Pentecostal Holiness Publishing Co.; Hughes-Broadwell; Moore Business Forms, Inc.; Benefit Association of Railway Employees; California Fruit Growers Exchange; Brunner Printing Co., Inc.; Public Service Coordinated Transport, Newark, N.J.; Manifold Stationery Co.; Radio Corporation of America; Crusader Press, Inc.; B & W Supply Corp.; Consumers Profit Sharing Co.; Royal Insurance Co.; The Woodson Press, Inc.; S. A. Meyer Co.; Southern States Cooperative Inc.; The Baugh-man Co.; Wilot Printing Co.; Peoples Drug Stores, Inc., Washington, D.C.
Refund Claim Filed August 28, 1956: Bancad Corp. of America.
Refimd Claim Filed April 17, 1957: Uniform Printing & Supply; Keystone Automobile Club.
Refund Claim Filed February 5, 1958: Select Publications, Inc.
(c) Of all the above-mentioned machine models set forth in the chart, only the Davidson machines and the ATF Chief 15 are subject to the excise tax hereinabove mentioned. The Davidson machines are the only ones of such machines that can do both letterpress and lithographic printing. All the others do only offset lithography.
(d) The Davidson machines hereinabove referred to are capable of performing fine quality work in all of the operations hereinabove described, including color work in as many as four colors. Within their paper size ranges, their product can be the equal of that performed on the listed machines of the other manufacturers and even on larger machines which are generally classified as commercial printing shop “presses” and which are not subject to the tax herein involved. However, other offset machines of other manufacturers, as will be hereinafter described, which are marketed as “duplicators” and which are subject to the tax, can produce work, including color work, which is indis *488 tinguishable from the offset work product of the Davidson machines.
29. (a) American Type Founders, Inc. characterizes its Chief 20 Model as a “Single Color Offset Press” operating on the “Machine, Duplicating Offset Principle.” Its machine parts are exposed and its appearance and size would not generally be considered suitable as office equipment. Its Model Chief 15, which is subject to the excise tax, is described as an “Offset Duplicating Press”, operating on the same principle. Its advertising on this model states: “The 11 x 15" Offset Press designed for more profitable printing. * * * The ATF Chief 15 has * * * big press construction features available for the first time in the 11 x 15" size range. Some represent entirely new approaches in press design. All of them have been proven practical in hundreds of commercial plants. * * * Study them and you will agree that here is the small offset press that is truly designed for more profitable printing. The Chief 15 is a complete printing press with all the equipment required to turn out commercial printing jobs fast and profitably. It is not a ‘stripped-down’ model to which you must add hundreds of dollars’ worth of ‘optional extras’ to do salable commercial work.” The machine parts are generally enclosed and in appearance would be more suitable as office equipment than the Model 20.
(b) Miehle refers to its Model 20 as its “Lithoprint Offset Press.” Its literature on this model states: “Ink rollers simultaneously supply ink and moisture to the plate in correct proportions to insure proper printing conditions.” Its Model 17 is described as an “Offset Press.” The company advertises itself as the “World’s Largest Manufacturer of Sheet Fed Presses.”
(c) Harris-Seybold Company refers to its Model 120 as an “Offset Job Press.” It advertises with respect to it: “The Fast-On, Fast-Off press with all the advantages of Notary Offset Printing. * * * Big press features available for the first time in the 14 x 20" sheet size * * *. * * * a barrel cam enables the pressman to make his setting exact, not approximate. * * * Use the entire plate if you like. The increase in size-makes little difference to the lithographer *489 . . . little difference in your customer’s budget. * * * Time saved means more time for other profitable jobs.” It refers to its larger Model 122 as a “Single Color Offset Press”, and its advertising with respect thereto also refers to the operator as a “pressman.”
30. (a) As hereinabove noted in finding 25, machines employing the stencil and spirit or hectograph processes are commonly considered in commercial circles as falling in the office “duplicating” machine or equipment category.
(b) The stencil process was originated by Albert Dick of A. B. Dick Company, which also adopted the trade name “Mimeograph,” a word which has now come to be generally used to identify the type of machine that uses a stencil, stencil-type ink and special absorbent paper. The “Mimeograph” was developed about 60 years ago and has been marketed as a “duplicating” machine. In this process, a stencil, which is a sheet of paper-like material with special long fibers coated with wax, is placed in a ribbonless typewriter where the type bars directly strike the surface of the stencil and break away the wax in the pattern of the character intended to be reproduced. The breaking away of the wax may also be accomplished with a stylus or other sharp pointed object. The cut stencil is then placed on the outside of a drum of the mimeograph machine and a pad holding fluid ink is placed on the inside. The drum is rolled over a special sheet of mimeograph paper and the fluid ink is forced through the fibers where the wax has been so broken and is deposited on the mimeograph paper. This paper has a special absorptive quality so that the ink will penetrate into it and not remain wet on the surface. The machine is simple of operation and is limited in the number of copies that a single stencil may produce, several hundred to a thousand being the practical maximum. There are now many other manufacturers of stencil machines in competition with the “Mimeograph.”
(c) An outstanding manufacturer of machines employing the spirit or hectograph process is Ditto, Incorporated, which produces the well-known “Ditto” machines. This process was originally known as the gelatin process, involv *490 ing the preparation of a sheet of gelatin on which purple ink is deposited by typing or writing. This process now involves a rotary machine and a hectograph master, consisting of two sheets, (1) a hectograph carbon paper containing purple ink, (2) a sheet which is the equivalent of a gelatin surface. By typing or using a stylus on the back of the sheet containing the gelatin surface, the front of that sheet is pressed against the carbon paper with the result that some of the purple hectograph carbon is transferred to the front of the gelatin surfaced sheet. The forward reading typewritten image on the back of the sheet creates a reverse reading image on the front of the sheet. The sheet is then placed upon a revolving cylinder. Special copy paper is fed to the machine and this paper receives a moistening of alcohol. The paper then comes in contact with and receives the hectograph carbon image on the hectograph master, the alcohol on each sheet of the copy paper causing some of the carbon (ink) to dissolve, the dissolved carbon being transferred to the paper by pressure. The number of copies produced is limited to the ink supply contained in the master, normally 200. Both the paper and the ink are special types.
(d) The products of the stencil and hectograph process are of a poorer quality than the products of the offset lithographic process. Furthermore, in the latter process the type and quality of paper or other surfaces which can be used are relatively limitless. For instance, offset work may be done on coated, hard, soft, bond or rag paper stocks, as well as on cloth or metal materials. In addition, while the mimeograph and hectograph processes are essentially designed for use in business and other administrative offices requiring a limited number of copies of the item to be reproduced, as many as 20,000 to 50,000 copies may be produced from metal plates in the offset lithographic process. When special bimetallic plates are used, 100,000 copies are possible. The principal reason for this difference is that in the stencil and spirit processes the ink supply is limited to the amount in a self-contained sheet, which is dissipated relatively quickly, *491 whereas in the offset process with metallic plates the ink is constantly supplied from an external source, in effect making each reproduction an original. Thus, the reproductions can be made indefinitely and as long as the metallic plates last. However, the number of copies that can be obtained from paper plates varies greatly, depending upon the weight and strength of the paper and how the image is placed on the paper. Such number may vary from 50 to 30,000 copies.
The mimeograph stencil machines sell for as low as approximately $225. However, such machines come in various sizes and models, with some being small table models. The larger machines are, of course, more expensive. These machines, and the hectograph machine, are quieter in operation than the Davidson Dual-Lith machines or offset lithographic machines in general.
(e) The patents issued by the United States Patent Office covering the machines that embody and utilize the stencil and hectograph processes characterize them as being for “Duplicating Apparatus”, a “Duplicating Machine”, “Stencil Duplicating Apparatus”, “Means for Attaching Stencil-Sheets to Duplicating Machines”, “Copying Machine”, and a “Multiple-Copying Machine”. In its advertising and sales literature, Ditto, Inc. refers to its spirit process machines as “Duplicating Machines, Spirit Process”. The A. B. Dick Company refers to its stencil machines as “Duplicating Machines, Stencil Sheet Type.” This company also manufactures a line of spirit process machines to which it refers as “Direct Process, Spirit Duplicators.”
(f) All of the above-mentioned stencil and spirit process machines of the A. B. Dick Company and the Ditto Company are subject to the Federal excise tax herein involved.
31. (a) Another nationally known reproducing machine that is commonly referred to as a “duplicating” machine is the “Multigraph”, which is manufactured by the Addresso-graph-Multigraph Corporation. The “Multigraph” was developed in 1901 as a means of imitating typewriting. It utilizes small pieces of type set in the grooves of a drum to *492 form a complete letter. The type is covered by an inked ribbon against which paper is pressed by a roller. The paper receives the inked impression of the type characters through the ribbon. However, the entire letter is completed in one impression so as to convey the effect of a personally typed letter. The method used by the Multigraph has one characteristic of letterpress in that its characters are raised. The machines can use loose or foundry type, electrodes, and rubber plates in performing basically the direct printing function of letterpress. However, the manner of applying ink is different from the letterpress process in that the ink creating the image is contained in an inked ribbon against which the type is pressed to form the image on the paper through the ribbon. Thus, the ink is not applied directly to the raised type from an external source each time a separate sheet is to be printed, as in the normal printing process, nor is there direct contact between the type and the paper. As shown in finding 25, “Multigraph” machines are specifically taxed by name in Section 3406(a) (6) of the Internal Revenue Code of 1939, and Section 4191 of the Internal Revenue Code of 1954.
(b) The Addressograph-Multigraph Corporation also manufactures a three-drum or cylinder offset lithographic machine, developed in 1934, called the “Multilith.” This machine was built so as to eliminate the occupational hazards incident to other offset lithographic machines and to make highly developed skills unnecessary for its operation, so that the ordinary type of office employee could operate it. Though the previously mentioned machine manufactured by Addressograph-Multigraph Corporation is known as the ££Multigraph” and this particular machine as the “Multi-lith”, both are advertised and sold as a “Multigraph Duplicator” with the words “Multilith Model” or “Multilith Process” added as a further designation for the lithographic machine. As shown, the “Multigraph” operates at least in part on the relief principle, while the “Multilith” operates on the offset lithographic principle. The Multilith machines *493 can use either metallic or paper plates. In addition, certain of the newer models may be equipped to use Linotype slugs. These machines require an attachment known as a Chase imprinting segment to accommodate a standard Linotype slug. One multilith model (1278) handles check imprinting, numbering and magnetic encoding.
Neither the Multigraph nor the Multilith machine, when operated singly and not in tandem, can produce from both the letterpress and lithographic principles simultaneously, nor can they perform any of the other simultaneous operations the Davidson machines can perform, as described above in findings 9-12.
32. Both the A. B. Dick Company and Ditto, Inc. have, since the development of their original stencil and spirit process “duplicating” machines described in finding 30, also developed and are now marketing a line of machines which employ the offset lithograph principle. They do not perform letterpress work or the simultaneous operations of the Davidson machines.
33. (a) The offset machines manufactured by A. B. Dick Company, Ditto, Inc., and Addressograph-Multigraph Corporation referred to in findings 31 and 32 are generally, insofar as sheet size, weight, speed, and price are concerned, similar to the Davidson Dual-Lith machines when operating on the offset lithographic principle. In addition, the work product of such machines can not be distinguished from the lithographic work product of the Davidson machines. Accordingly, these offset machines of such other companies may, in certain aspects, be considered to be in competition with the Davidson machines.
The following chart shows the maximum and minimum sheet sizes of certain of the competitive offset machines produced by the Addressograph-Multigraph Corporation, the A. B. Dick Company, and Ditto, Inc., their weights and prices, and the maximum speeds at which they can operate, measured by the number of impressions per hour that can be produced:

*494

*495 (b) All of the above-mentioned offset machines of the A. B. Dick Company, Ditto, Inc., and the Addressograph-Multigraph Corporation are subject to the Federal excise tax involved herein.
34. (a) The Addressograph-Multigraph Corporation refers to their machines in their advertising and sales literature, including their offset machines, as “duplicators.” For instance, such literature states with respect to its Model 1250 that it is:
Designed for all types of office duplicating where quality, speed and volume are determining factors — for the simple reproduction of clear, clean, accurate copies— in the privacy of your own office.
In addition to normal duplicated material such as reports, bulletins, all kinds of communications ... forms, business stationery, pictorial advertising and promotional material, in one or more colors, can be produced quickly and easily on the Class 1250 Series Multigraph Duplicators.
Using Multilith Masters, the Class 1250 Series will give you complete business records from blank paper.
It also states:
Operating functions are designed into the machine rather than left to the uncertainties of operator skill. Quality reproduction can be expected from an average office employee operator with a minimum of training.
and that the machine fulfills:
The thousand and one miscellaneous requirements of a modern business office necessary to keep an organization informed. They include such internal and external communications as letters, bulletins, price lists, reports, meeting minutes, etc. * * * A fast, economical method of producing, as needed, all the varied forms — temporary and permanent — used in the conduct of a business. Accounting, production, financial and administration forms are typical examples. Duplicating of this nature must be of commercial quality, yet the process employed must be compatible with office standards of simplicity.
Both the names Multigraph and Multilith are registered trademarks of the Addressograph-Multigraph Corporation. The Model 1250 is referred to as the “Multigraph-Multilith Offset-Duplicator.” The Company advertises that “The *496 Multigraph Model 2066 is designed for high speed, heavy duty duplicating and employs the * * * Multilith Process.”
However, when specifically addressing itself to the commercial printing establishment field, to which it also sells its Model 1250, the Company uses sales literature on such model which does not employ the term “duplicator”. Such literature instead refers to the machine as “Multilith Offset Class 1250” and describes it as producing “quality results equaled only by higher priced presses.” It further advertises to such market that the machine has “big press features” with “small offset equipment advantages”, and that “when you own Multilith Offset you can become a single source of service . . . handle all jobs large or small — accommodate your regular customers — gain new customers — devote your large presses exclusively to high volume jobs.” Pictorially illustrated is a commercial type print shop with a shop pressman type of employee operating the machine. The machine is offered with numbering and perforating attachments, and is capable of performing three-color process work. It operates on the conventional three-cylinder principle.
The Multilith Offset machine is also produced in a tandem model and a model for magnetic ink encoding of checks which produces bank checks meeting the exacting standards of the American Banking Association, as do the Davidson machines, also using such special ink.
(b) The A. B. Dick Company calls all of its offset machines “duplicators.” In its publication on “Duplicating Products” entitled “Catalog of A. B. Dick Modern Duplicating,” published in 1959, it refers to “Offset” as one of several modern duplicating processes in which it includes “Offset”, “Photocopy”, “Mimeograph”, and “Spirit.” With respect to its Model 350, the company advertises that “For high quality, high production offset duplicating,” the “A. B. Dick Model 350 offset duplicator is specially suited to producing letterheads, forms, envelopes, catalog sheets, price lists, and many, many other general duplicating requirements.”
(c) Ditto, Inc. refers to its offset machine as an “Offset Duplicator.”
*497 (d) All the above-mentioned offset machines of the A. B. Dick Company, the Addressograph-Multigraph Corporation, and Ditto, Inc. operate with ink roller and moistening systems generally applicable to offset lithographic machines, including the Davidson offset machines, except that they employ the conventional three-cylinder principle. They can operate with a variety of plates, including metallic and paper.
35. Where the operation of the Davidson Dual-Lith machines is confined to paper masters on which the image is produced by ordinary typewriters, their operation is relatively simple. As noted above, in their sales material plaintiffs have emphasized the general ease of operation of their machines. However, for a full knowledge of the complete operating processes which the machine is capable of performing, including letterpress and photographic metallic plate offset work, considerably more training would be necessary. Davidson conducts an operator training program in connection with the sale of its machines of which purchasers may avail themselves, without charge. The operation of a lithographic process machine with metallic plates or a rotary letterpress, to which the Davidson machines can be converted, is sufficiently complicated and involves the use of such auxiliary equipment and other devices as to require some special training in order to obtain the full usage thereof. The Davidson training course to which a purchaser is entitled covers 40 hours of instruction, although operators who have already had some knowledge or experience, or particularly adept operators, may require less. As noted in finding 27(a), the Typographical Union makes available to its members a 3-week training course in the operation, including color application, of various offset machines, including the Davidson.
In contrast, the operation of a stencil or a hectograph machine is relatively simple. General office employees may be taught such operation in a relatively short period of time.
The Davidson course of instruction does not include the techniques of color work, which all Dual-Liths are capable *498 of performing. Color work is an art requiring years of experience in the matching of colors and in accurately registering the machine. The offset machines manufactured by the A. B. Dick Company and the Addressograph-Multi-graph Corporation are also capable of performing color work.
3.6. By letter of August 7, 1945, Craftsman Press, Inc., a commercial printing establishment which was a prospective purchaser of a Davidson Model 221, then called the Davidson Dual Duplicator, wrote to defendant seeking a ruling as to the applicability of the manufacturers’ excise tax to the machine as equipped for offset work. By letter of August 30, 1945, headed “Excise Tax Advisory Memorandum,” the Deputy Commissioner of Internal Revenue responded as follows:
Reference is made to your letter of August 7, 1945, requesting a ruling as to the application of the manufacturers’ excise tax with respect to a Davidson Dual Duplicator equipped for offset which you intend to purchase from the Davidson Manufacturing Corporation, 1020 Adams Street, Chicago, Illinois. A copy of a letter dated August 3, 1945 from the Davidson Manufacturing Corporation relative to this matter was received in this office with your letter. It is stated that you are a commercial printing establishment and that this Sment will be used by you in the manufacture and iction of goods for your customers.
It is to be noted that the taxability of a business and store machine subject to tax under Section 3406(a) (6) of the Internal Revenue Code, as amended, is determined by the inherent characteristics of the particular machine in question and not by the use to which the machine may 'be put after sale. Therefore, since the Davidson Dual Duplicator involved is considered to be taxable under Section 3406(a) (6) of the Code, tax will attach to the Davidson Manufacturing Corporation’s sale thereof, regardless of the fact that the duplicator may be purchased by you for use in the manufacture and production of goods for your customers.
37. As set forth in finding 15 (b), by letter of June 2,1947, Davidson made a request of the defendant for a ruling concerning the applicability of the excise tax to certain of its folding machines. By letter of July 22, 1947, defendant *499 ruled that the tax was not applicable to two models of such machines which were “of the type used in industrial plants and job printing”, but that the tax was applicable to another model. By letter of October 3, 1950, which was shortly after Davidson’s acquisition by Mergenthaler, Davidson again requested a ruling with respect to the applicability of the manufacturers’ excise tax to certain of its folding machines, and also to its tandem Model 225 line. By letter of December 12, 1950, the Deputy Commissioner of Internal Revenue advised Davidson as follows:
Reference is made to your letter of October 3, 1950, relating to the manufacturers’ excise tax imposed on various business machines, including folding machines, by section 3406(a) (6) of the Internal Revenue Code, as amended.
You request a ruling as to the application of this tax with respect to your sales of the models Nos. 225A, 225B and 225C Multiple Davidson Dual machines of your manufacture. A description and specifications of each of these machines were attached to your letter. It is stated that the machines are designed for and will be sold to the graphic arts industry and they are used by printers or companies owning their printing shops.
The models Nos. 225A, 225B and 225C Multiple Davidson Dual machines are not taxable under section 3406(a) (6) of the Code and, therefore, it is held that you will incur no excise tax liability with respect to your sales thereof.
.38. As a result of the favorable ruling set forth in finding 37, Davidson, on February 15,1951, filed a claim for refund in the amount of $7,958.86 of the excise taxes previously paid on sales of Model 225 for the period February 28, 1950 to November 30,1950. The claim stated in part as follows:
The foregoing excise tax was paid in connection with the sale of Models 225A, 225B and 225C of the Multiple Davidson Dual sold by Davidson Corporation. The taxpayer has now received a ruling that these models are not subject to Sec. 3406(a)(6) of the Internal Revenue Code. The excise tax on these models was therefore paid in error. * * * The tax paid between Feb. 28, 1950 and to and including June 30, 1950 was paid by Davidson Manufacturing Corporation. On June 30, 1950, that corporation ceased to do business, *500 changed its name to Chicago Duplicator Co. and transferred all of its assets of every nature whatsoever to Davidson Corporation. Attached hereto is a certified copy of the bill of sale between Chicago Duplicator Co. and Davidson Corporation.
39. By letter dated December 4, 1951, Davidson requested a ruling with respect to the applicability of the manufacturers’ excise tax on its Model 238. The letter stated in part as follows:
Davidson Corporation manufactures Paper Folding Machines, Paper Feeding Machines, the Davidson Dual Model 221 which has been referred to as a duplicating machine, the Davidson Dual Model 251 which is a new model and which is supplanting the Model 221 in the Davidson line, the Multiple Davidson Dual Models 225A, 225B, and 225C, and special printing machinery and paper handling equipment which is manufactured to order. Davidson Corporation has developed and is now about to market a new model printing press which has been designated as Davidson Dual Model 233.
# ifc
On June 2nd, 1947 Davidson Manufacturing Corporation addressed a letter to you which requested a ruling, among other things, with respect to whether certain Folding Machines manufactured by Davidson Manufacturing Corporation, and which were of the type used in industrial plants and job printing, were or were not taxable machines within the meaning of Section 3406 (a) (6) of the Internal Revenue Code as amended. Your reply thereto, dated July 22nd, 1947, Ref. MT :ST :WF: held as follows:
“Since the Model No. 129 and Model No. 133 Folding Machines of your manufacture are of the type used in industrial plants and job printing, it is the position of the bureau, that such machines do not come within the scope of Section 3406(a) (6) of the Code and, therefore, it is held that you will incur no excise tax liability with respect to your sales of these particular Folding Machines. The Model 121 Folding Machine of your manufacture is considered to be a taxable office machine, within the meaning of section 3406(a) (6) of the Code and, therefore, it is held that tax under this section of the code attaches with respect to your sale of the Model No. 121 Folding Machine.”
*501 With respect to the Davidson Dual Model 221 tax.has been collected and paid on all sales of this model, since a considerable portion of the sales of this machine have been for use as office equipment. However, no ruling has ever been specifically requested nor obtained with respect to this model. In like manner and for similar reasons, we have collected and paid tax on all sales of the Model 251 Davidson Dual.
*****
We are attaching to this letter photographs of the new Model 233 Davidson Dual Press which we have recently developed and are now about to market. We are also attaching advertising material which has been prepared covering this Model and which contains certain specifications with respect to this machine. The Model 233 Davidson Dual Press has been developed by us as an offset lithographic printing press which will handle a sheet of paper 14" x 17%" in size and have a printing area of 13" x 17". This press has been developed by us primarily for the printing and graphic arts industries. This press occupies 65" x 35" of floor space and is 56%" high. It weighs 1184 pounds.
We believe it is obvious from the foregoing that this machine is not a business or store machine as contemplated in Section 3406(a) (6) of the Code as amended. It is our belief that our Model 233 Press is comparable both in purpose and use to the presses manufactured by the Harris-Seybold-Potter Company of Cleveland, Ohio, and the Webbendorfer Division of American Type Founders Company of Elizabeth, N.J. Both of which, we understand, have been ruled to be non-taxable.
To substantiate our claim that our Model 233 press will be used principally in job printing plants and in printing plants owned by private concerns, we have compiled statistics as to the ultimate use of all of the orders which we have so far received from ultimate users of this machine. Of a total of 24 orders received to date, 19 are from printing concerns, 3 are from companies which are not primarily printers but each of these machines is to be used in a department specifically performing the printing and binding work of the particular company. One is from a Department of one of the State Governments and one is from an Insurance Company. The situation with respect thereto is therefore similar to the situation before the Department of Internal Revenue when the rulings were made with respect to the Models 129 and 133 Folding Machines and the *502 Models 225A, 225B and 225C Davidson Multiple Duals referred to above.
We, therefore, respectfully request that our Model 233 Davidson Dual Press be ruled to be not taxable under Section 3406(a) (6) of the Code as amended. We further respectfully request that this matter be reviewed as quickly as possible in view of the fact that we wish to market this Model immediately. * * *
40. (a) By letter dated February 28,1952, from the Deputy Commissioner of Internal Revenue to Davidson, the ruling of December 12, 1950, referred to in finding 37, with respect to the tandem models 225, was reversed. The letter stated as follows:
Reference is made to Bureau letter addressed to you under date of December 12, 1950, in reply to your letter of October 3,1950, holding that you incur no excise tax liability under section 3406(a) (6) of the Internal Revenue Code, as amended, with respect to yoúr sales of the Models Nos. 225A, 225B and 225C Multiple Davidson Dual machines of your manufacture. This ruling was based on information furnished by you to the effect that these machines are designed for and will be sold to the graphic arts industry, and that they are not designed for nor will they be sold as business or store machines within the meaning of section 3406(a) (6) of the Code.
A careful review of the information now on file in connection with this case discloses that Davidson Corporation purchased all of the assets and assumed all of the liabilities of Davidson Manufacturing Corporation on June 30, 1950, and is now carrying on the business formerly carried on by Davidson Manufacturing Corporation.
The Model 221 Davidson Dual Duplicator which is a taxable machine under section 3406(a) (6) of the Code was manufactured by Davidson Manufacturing Corporation. This machine is sold by Davidson Manufacturing Corporation either equipped for offset and relief duplicating, equipped for offset duplicating only or equipped for relief duplicating only. Relief duplicating refers to the use of any kind of raised type such as electrotypes, rubber plates or loose type. Offset duplicating refers to the use of thin metal or paper plates. The image or form used on these plates is neither raised nor lowered, the process used being similar to standard lithography. Your question and answer booklet on file in this office relating to the Model 221 Davidson Dual *503 Duplicator states: “Q: Is it practical for office use? A: Tbe Davidson Dual Duplicator bas a definite place in any kind of business where office forms, stationery, form letters, advertising literature, etc., are used to any great extent. Within its paper size range, 3" x 5" to 10" x 14" (duplicating area 9%" x IS"), it will handle practically your entire duplicating requirements at an average saving of 25 percent to 50 percent.”
The advertising matter on file in this office covering the Model 221 Davidson Dual Duplicator states “The advantages of offset duplication particularly for office use have been demonstrated and definitely established during the past few years and for certain types of work it is by far the most satisfactory method. On the other hand, there are many jobs that are most effectively and economically handled by relief duplicating or by a combination of both. * * * The advantages of offset duplication particularly for Government office use have been demonstrated and definitely established during the past few years, and for certain types of work it is by far the most satisfactory. Offset duplication has been found most practical for such work as:
“1. Reproduction of all typewritten matter including letters, bulletins, price lists and etc.
“2. Line drawings, diagrams, charts, longhand, signatures and etc.
“3. Photographically reproduced copy of any kind such as half tones of photographs, washed drawings or reprints and etc.”
A folder on file in this office covering the Models Nos. 225A, 225B and 225C Multiple Davidson Dual machines states that “The Multiple Davidson Dual embodies the proven principles of the standard Davidson Dual. It consists of two printing units, an automatic suction pile feeder, and an intermediate conveyor which carries the sheets from the first unit to the second.
“Each of these two units may be operated either offset or letterpress and the changeover from one method to the other is easily made in a few moments at any time. Furthermore, the second unit may be entirely disengaged when you want to run a simple one-color, one-side job on the first unit. The intermediate conveyor is easily adjusted to carry the sheets face up or tumbled as required.”
The descriptions and specifications submitted with your letter of October 3, 1950, covering the Multiple Davidson Dual machines state: “By a simple and *504 ingenious method, one machine only may be operated without wear on the second unit.”
A report received in this office from an internal revenue field agent regarding this matter states that the Models Nos. 225A, 225B and 225C Multiple Davidson Dual machines have the same general specifications and are adaptable to the same operations as the Model 221 Davidson Dual Duplicator which is taxable under section 3406(a) (6) of the Code.
On the basis of the information now on file, it is held that on and after the date of this letter tax under section 3406(a)(6) of the Code attaches at the rate of 10 percent with respect to your sales of the Models Nos. 225A, 225B and 225C Multiple Davidson Dual machines of your manufacture. The Bureau ruling issued to you under date of December 12,1950 is hereby revoked.
(b) In another letter of the same date to Davidson, said Deputy Commissioner responded to Davidson’s request of December 4, 1951, for a ruling on Model 233, set forth in finding 39, holding the excise tax applicable to the sale of this machine. The letter stated in part as follows:
The information furnished by you has been carefully reviewed, and it is the opinion of this office that the Model No. 233 Davidson Dual machine is a taxable duplicating machine within the meaning of section 3406(a) (6) of the Code. Therefore, it is held that the tax at the rate of 10 percent attaches to your sales of this machine.
You state that the Model No. 233 Davidson Dual machine is comparable both in purpose and use to the nontaxable presses manufactured by Harris-Seybold-Potter Company, Cleveland, Ohio, and the Webben-dorfer Division of American Type Founders Company, Elizabeth, New Jersey. The information furnished by you in this connection is too indefinite. If certain presses manufactured by these companies are similar in design and comparable in purpose and use to the Model No. 233 Davidson Dual machine, it is suggested that you identify the particular press or presses involved and, if possible, submit any available advertising matter or circulars which illustrate and describe the press or presses. Upon receipt of this additional information, further consideration will be given to this matter.
*505 41. By letter of March. T, 1952, to the Commissioner of Internal Be venue, Davidson furnished the additional information requested by defendant’s letter of February 28,1952, referred to in finding 40(b), and requested that further consideration be given to the question of the applicability of the tax to its Model 233. The letter furnished data with respect to the ATF Chief 20, referring to such “directly competitive” machine as “a lithographic press which is comparable in purpose and use to the Model 233 Davidson Dual Press. It is similar in design and varies from the Model 233 Davidson Dual Press only in those characteristics of design which are natural differences as between the products of two different manufacturers.” A detailed description of the physical characteristics of the ATF 20 was given, together with a comparison with the Davidson Model 233. It also referred to an ATF letterpress machine, the “ATF Little Giant Model 6” and compared it with the Model 233 when performing letterpress operations, stating: “While the ATF Little Giant Model 6 is quite different in detail of design from the Model 233 Davidson Press, it is nevertheless illustrative of a nontaxable letterpress which is similar both in purpose and use to the letterpress application to the Model 233 Davidson Press.” The letter then went on to refer to the Harris Model 122A, which it described as being “similar in purpose and use” to the Model 233, and further stated:
The Davidson Corporation designed and built the Model 233 Davidson Press as a combination Offset and Letterpress Printing Press for use in the Graphic Arts. It has not been our intention or the intention of our parent company, the Mergenthaler Linotype Company of Brooklyn, New York, that we should make or sell another “duplicating machine” or a “business or store machine” at this time. All of our engineering, all of our tooling, and all of our production plans have proceeded on the assumption that we were building a Printing Press, and that we had no other intention. All of our sales plans have been laid and executed on the assumption that we were marketing and selling a Printing Press. We have had no other intention. This is borne out by the fact that the publication advertising *506 covering tbe Model 233 Davidson Press has appeared in the Graphic Arts Monthly, in the Inland Printer, in the American Printer, in the Western Printer and Lithographer, in the Canadian Printer and Publisher, and in the New England Printer and Publisher, and in no other publications.
The Davidson Model 233 Dual Press is classed as a Printing Press under paragraphs 1 and 8 of the regulations promulgated by the Joint Congressional Committee on Printing, and as such, this equipment cannot be purchased by any government department or installation except with the specific authorization of the Joint Congressional Committee on Printing.
It is respectfully submitted that the proper test to be applied in determining whether or not the Model 233 Davidson Press is taxable under Section 3406(a) (6) of the Code as amended is whether the Model 233 is a “printing press” or a “duplicating machine”. It is our opinion that the argument which has been outlined above and the material which has been submitted in connection therewith amply supports our contention that the Model 233 is a printing press. It is obvious from the wording of Section 3406(a) (6) that it was not the intention of Congress to impose the Manufacturers’ Excise tax on printing presses. The Treasury Department has so interpreted the law and has, as a matter of fact, not collected the tax on printing presses. In view of the fact that the Model 233 is a printing press, Section 3406(a) (6) is not applicable and the tax should not be imposed.
* * * The imposition of the excise tax on this Model by your letter of February 28,1952 is causing us serious damage with each day that goes by since a similar tax is not imposed upon those presses with which we are competing as more fully explained and described herein above.
42. (a) By letter of May 16, 1952, the Deputy Commissioner of Internal Revenue rejected the claim for refund with respect to tandem Model 225, referred to in finding 38. The letter stated in part as follows:
The tax, refund of which is claimed, was paid by you on sales of Models Nos. 225A, 225B, and 225C Multiple Davidson Dual machines. The records of this ónice disclose that a ruling was issued to you on February 28, 1952, holding these machines taxable under section 3406(a)(6) of the Code.
*507 In any event, no allowance may be made in this case for the reason that you have not submitted evidence showing your compliance with the provisions of section 3443(d) of the Code which prohibit the Commissioner from allowing a refund or credit unless the person who paid the tax establishes that he has not included the tax in the price of the article or collected the amount of the tax from the vendee or that he has repaid the amount of the tax to the ultimate purchaser of the article; or, unless he files with the Commissioner the written consent of the ultimate purchaser to the allowance of the refund or credit.
In view of the foregoing, your claim for refund of tax in the amount of $7,958.86 is hereby rejected in full.
(b) By letter of May 22, 1952, Davidson requested the Commissioner of Internal Revenue to keep its claim open to allow it to amend the claim by filing the written consents of the ultimate purchasers to the allowance of the refund. By letter of July 14,1952, the Deputy Commissioner of Internal Revenue responded as follows:
Reference is made to your letter of May 22, 1952, relating to your claim for refund in the amount of $7,958.86, representing manufacturers’ excise tax paid by you under the provisions of section 3406(a) (6) of the Internal Revenue Code, as amended, for the period February 1950 to November 1950, inclusive.
The claim was rejected in full by Bureau letter dated May 16,1952, for the reason that the machines with respect to which you request a refund of the tax paid by you to the Government on your sales thereof are properly subject to the tax imposed by section 3406(a)(6) of the Code. You were advised that in any event no allowance may be made in this case for the reason that you have not submitted evidence showing your compliance with the provisions of section 3443(d) of the Code.
You request the Bureau to keep this claim open to allow you to amend the claim and to file in support of the claim, as amended, the necessary written consents of ultimate purchasers to the allowance of the refund.
Section 3772(a) of the Code provides that no suit or proceeding shall be begun after the expiration of two years from the date of mailing by registered mail by the Commissioner to the taxpayer of a notice of the disallowance of the part of the claim to which such suit or *508 proceedings relates. Therefore, additional evidence in support of the claim filed by you must be submitted in sufficient time to permit the Bureau to reopen the claim and take final action within two years from the date of its original rejection. Such additional evidence should be submitted by you to the Director of Internal Revenue, 22 West Madison, Chicago 2, Illinois, attention Head, Collection Division.
43. By letter of August 8, 1952, to Davidson, the Deputy Commissioner of Internal Revenue responded as follows to Davidson’s request for a reconsideration of defendant’s ruling on the Model 233:
Reference is made to Bureau ruling issued to you under date of February 28, 1952, stating that it is the opinion of this office that the Model No. 233 Davidson Dual machine of your manufacture is a taxable duplicating machine within the meaning of section 3406 (a) (6) of the Internal Revenue Code, as amended, and holding that tax at the rate of 10 percent attaches to your sales of this machine.
Reference is also made to the several letters which you submitted to this office protesting the application of the tax with respect to your sales of the machine. In a letter from this office dated May 16, 1952, you were advised that it has been found necessary to refer this matter to a field agent of the Bureau for additional information.
The report in this matter has been received in this office, and the information compiled as a result of a field investigation fails to establish that the Model No. 233 Davidson Dual machine is comparable to the presses operated by skilled and qualified pressmen and which are commonly and commercially known as printing presses. The Bureau ruling of February 28,1952, holding the Model No. 233 Davidson Dual machine taxable under section 3406(a) (6) of the Code is hereby affirmed.
44. (a) On May 4, 1954, Davidson filed an “amended and supplemental” claim for refund with respect to its tandem Model 225 in the amount of $4,346.80. The difference of $3,612.06 between this amount and the amount of the original claim of $7,958.86 represented the amount for which consents were not procured. In support of this amended claim, Davidson stated in part as follows:
2. Model No. 225-A is designed to print both sides of paper, one side by offset (lithograph) and the other by *509 relief, (letter press) and in two colors. Model No. 225-B (strictly offset) produces one color on both sides of paper or one color on one side and another color on the reverse side. Model No. 225-C is designed to print both sides of paper, either both sides by offset (lithograph) or one side by offset (lithograph) and one side by relief, (letter press), in two colors. The results achieved by both models 225-A and 225-C may be by the exceptionally versatile use of:
1. Loose type.
2. Curved electrotypes.
3. Standard linotype slugs.
4. Rubber plates.
5. Paper masters.
6. Metal photo-offset plates.
These machines are not intended, as are ordinary statutory “duplicating” machines (Section 3406(a) (6)) for the use of ordinary paper stencils or spirit duplicating master prepared stenographically on an office typewriter.
The maximum paper size of these three models is 10" x 14".
3. The factory, FOB selling prices of these presses were approximately:
1. Model 225-A, $3,950.00.
2. Model 225-B, $4,200.00.
3. Model 225-C, $4,300.00.
far in excess of the ordinary office variety of so-called “Duplicating” machine.
4. By way of illustration; while locomotives are designed and built for sale to and use by railroads, as such, they are nevertheless for sale to and commonly sold to anyone having use therefor. Similarly these three presses, as with respect to all of the presses produced and sold by the claimant, were designed primarily for sale to and use by and in the Graphic Arts (printing) Industry, itself, to which the claimant devoted its prime attention and directed its sales efforts and upon which it primarily depended for the sale of its manufactured output of these and other models.
5. The claimant’s secondary output, i.e., that which is not consumed strictly within the Graphic Arts Industry, as defined by the industry itself, is primarily consumed by that large segment of private printing plants, employing craftsmen, just as in the recognized Graphic Arts Industry itself, operated by corporations throughout the United States.
*510 6. The claimant is in no sense of the word, nor has it ever been, engaged in the manufacture and sale of “Business and Store Machines,” as such, nor indeed has its competition, in any major degree, ever stemmed from that industry. Its competition stems primarily from those manufacturers which cater to the Graphic Arts Industry, as such.
7. While in their relation to other printing presses, as such, the operations of the presses, the subject matter of this claim, have been reduced to the simplest of operational understanding in the hands of men skilled in the crafts they are, m this important particular, vastly distinguishable from business and store duplicating or other machines in that they require a far greater degree of skill than is ordinarily possessed by the office duplicating machine operator, the use of which can be taught to any ordinary clerk, totally lacking in experience, within a matter of hours and which is a major feature that distinguishes such “Business and Store Machines” as provided for in Section 3406(a) (6) of the Internal Bevenue Code.
‡ $
11. Irrespective of the merits of the question presented by this claim, that is, the taxability or non-tax* ability of the Models 225-A, B and C, it will be observed that the Bureau ruled on December 12, 1950, that these Models were not taxable under the provisions of Section 3406(a) (6) of the Code. That ruling was in full force and effect until its reversal on February 28, 1952, at which time it was announced and held that the tax would begin “on and after the date of this letter”, therefore, this claim should, in any event, be allowed. In other words the tax was not properly effective until the date of that letter, hence this claim is allowable without regard to the merits.
(b) Three days later, on May 7, 1954, Davidson filed its petition (No. 177-54) in this court for said sum of $4,346.80 concerning the taxes paid on the Models 225 specified in its amended claim.
45. (a) On August 28, 1956, Davidson filed a claim for refund in the amount of $39,785.32, with respect to manufacturers’ excise taxes for the period February 29, 1952 to March 31, 1953, paid upon Models 225 ($317.79), 221 ($277.16), 241 ($5,749.69), and 233 ($33,440.68). Attached to the claim were purchasers’ consents to such extent on *511 taxes which had. been previously paid in the amount of $78,278.66. Shortly prior to filing this refund claim, Davidson and Mergenthaler had joined in a request to the Internal Eevenue Service to reconsider the former rulings with respect to Models 225 and 233, and, in addition, for a ruling on Davidson’s other Dual-Lith models. Such request, and the August 28, 1956 claim for refund, constituted the first attempt by Davidson to have its Model 221 (241), introduced in 1940, declared exempt from the tax.
In support of its refund claim, Davidson emphasized its association with Mergenthaler and urged that this association removes “any vestige of remaining doubt” of Davidson’s “identity * * * with the printing or Graphic Arts Industry.” It referred to the Davidson patents on “printing presses,” and stated that “such patents have no application to ‘duplicating’ in the sense in which that word is clearly understood in administrative offices and business institutions generally,” or to “ ‘duplicating’ machines which are historically single purpose machines” which it described as stencil, gelatin process, spirit process, ink ribbon, and photocopying machines, “all of which are commonly intended for and found in general administrative business offices.” ít went on to describe the unique and versatile characteristics of its Dual-Lith machines. It also contrasted “the operation of the Davidson presses” by “men skilled in the crafts” to the operation of “business and store” duplicating machines, “the use of which can be taught to any ordinary clerk, totally lacking in experience, within a matter of hours * * * . ”
(b) On April 17, 1957, Davidson filed a claim for refund in the amount of $33,709.75, with respect to manufacturers’ excise taxes for the period March 24,1953 to March 18,1955, paid upon Models 223 [5] ($146.85), 225 ($523.77), 241 ($10,-909.83), 251 ($6,349.43), and 233 ($15,779.87). Attached to the claim were customers’ consents covering the complete amount previously paid on sales made during such period. The claim was supported by contentions similar to those set forth in subparagraph (a) above.
46. On April 26, 1957, Mergenthaler filed a claim for refund in the amount of $91,172.31, with respect to the man *512 ufacturers’ excise taxes for the period April 1,1953 to March 31, 1955, paid upon Models 224 ($263.64), 233 ($43,954.86), 241 ($35,625.20) and 251 ($11,328.61). Attached to the claim were customers’ consents covering the complete amount previously paid on sales made during such period. The claim was supported by contentions similar to those set forth in finding 45.
47. By letters of January 15,1957, and September 11,1957, Davidson and Mergenthaler jointly requested the Commissioner of Internal Revenue to reconsider the question of the taxability of Models 225 and 233. The letters further requested a ruling on the taxability of Models 221,223,227,237, 241,242, and 251. By letter of January 30,1958, the Internal Revenue Service replied as follows:
This is in reply to your letter of September 11, 1957, and your letter of January 15,1957, with which you submitted a 62 page memorandum relating to certain machines manufactured and sold by Davidson Corporation prior to April 1,1953, and since that time manufactured by Mergenthaler Linotype Company, its parent, and sold by Davidson Corporation. You request, on the basis of this information, that we reconsider the question of the taxability of the Davidson Models 225A, 225B, 225C and 233, and that we also rule on the tax-ability of the Davidson Models 221, 223, 227, 237, 241, 242 and 251. It is your contention that these machines are printing presses rather than taxable duplicating machines within the meaning of section 3406(a) (6) of the Internal Revenue Code of 1939 and the corresponding section 4191 of the 1954 Code which impose an excise tax of 10 percent on the business machines named therein when sold by the manufacturer, producer, or importer.
In a letter to Davidson Corporation dated February 28,1952, we held the Models 225A, 225B and 225C Multiple Davidson Dual machines to be taxable under section 3406(a)(6) oftheCode. In this letter we also stated that the Model 221 Davidson Dual Duplicator is a taxable machine under section 3406(a)(6) of the Code. In another letter of the same date to the corporation we held the Model 233 Davidson Dual machine to be a taxable duplicating machine within the meaning of section 3406( a) (6) of the Code.
The information attached to the file indicates that the taxpayer has filed and now has pending in the office *513 of tbe District Director, Brooklyn, New York, two claims for refund of $4,346.80 and $39,785.32, respectively, involving Davidson Models 225, 221, 241 and 233. Such information also indicates that the taxpayer has pending before the United States Court of Claims a claim for refund of $4,346.80, involving Davidson Models 225A, 225B and 225C.
It would be inappropriate for the Service to further consider the question of the taxability of the. Davidson Models 225A, 225B and 225C when this question is now pending before the United States Court of Claims. When this issue is decided by the Court, the Service will then issue a ruling as to the taxability of the other machines in question.
48. On February 5, 1958, Mergenthaler filed a claim for refund in the amount of $133,992.68, with respect to the manufacturers’ excise taxes for the period April 1, 1955 to March 31, 1957, paid upon Models 120 ($23.77),[6] 225 ($302.25), 227[7] ($332.73), 233 ($54,217.99), 241 ($59,903.44), 242 ($3,401.05), and 251 ($15,811.45). Attached to the claim were customers’ consents covering the complete amount previously paid on sales made during such period. This claim too was supported by contentions similar to those set forth in finding 45.
49. On December 16,1958, Davidson filed its petition (No. 546-58) in this court for the sum of $73,495.07 covering the two claims for refund set forth in finding 45.
50. On February 16, 1959, Mergenthaler filed its petition (No. 75-59) in this court for the sum of $225,164.99 covering the two claims for refund set forth in findings 46 and 48.
51. During all of the years in controversy before the court, plaintiffs prepared and filed the required manufacturers’ excise tax returns in the appropriate Collector’s or Director’s offices of the Internal Revenue Service and paid the tax thereon to the extent of the amounts claimed in the petitions filed herein.
52. By order of the court dated May 13, 1959, the three cases herein involved were consolidated.
*514 CONCLUSION 03? LAW
Upon the foregoing findings of fact, which, are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are not entitled to recover and the petitions are dismissed, with prejudice.

 Model 241 is the Model 221 with refinements added.

 Model 251 is the de luxe version of the 241 (221).

 This ruling was reconsidered and reaffirmed on August 8, 1952.

 This is another variation of the basic Model 221 (241).

 No evidence has been introduced with respect to this model, which is evidently a folding machine.

 This is still another variation of the basic Model 221 (241), with extra equipment.